Donald PARKER, Plaintiff,

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Metro–North Commuter Railroad Company, Metropolitan Transportation Authority Police Benevolent Association, Metro–North Police Benevolent Association, Railroad Police Benevolent Association and Robert Novy, Defendants.**

No. 99 Civ. 3032 (CM) (LMS).

United States District Court,
S.D. New York.

May 5, 2000.

Richard B. Wolf, Poughkeepsie, NY, for plaintiff.

Carol S. Barnett, Wendy Rothstein Bocian, Metro–North Commuter Railroad, New York City, for MTA defendants.

Allen M. Kranz, Kranz Davis & Hersh, Hauppauge, NY, for Union defendants.

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND/OR DISMISSAL

McMAHON, District Judge.

Plaintiff Donald Parker, a police officer with the Metro–North Commuter Railroad ("Metro–North"), brings claims for age and disability discrimination against: (1) the Metropolitan Transportation Authority

("the MTA"), Metro–North Commuter Railroad Company ("Metro–North") (collectively "the MTA Defendants") and (2) the Metropolitan Transportation Authority Police Benevolent Association, the Metro–North Police Benevolent Association, the Railroad Police Benevolent Association, and Metro–North PBA President Robert Novy (collectively "the Union Defendants"). Plaintiff was denied promotion to the rank of sergeant after Metro–North removed his name from an internal sergeant promotion list pursuant to the collective bargaining agreement ("CBA") in effect between Metro–North and Plaintiff's union, Defendant Metropolitan Transportation Authority Police Benevolent Association ("the Union"). Plaintiff brings claims under (1) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.;* (2) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.;* (3) 42 U.S.C. §§ 1981 and 1981a; and (4) New York State Executive Law § 296 ("the New York Human Rights Law").

The MTA Defendants have moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), or, in the alternative, summary judgment. The Union Defendants have also moved for summary judgment. Defendants' motions are disposed of as follows: summary judgment is (1) granted as to the MTA Defendants; (2) granted as to Plaintiff's ADA and ADEA claims against Defendant Novy; (3) denied with respect to Plaintiff's remaining claims against the Union Defendants. The proof at trial, however, shall be limited in accordance with this ruling.

## FACTS

### (1) *Plaintiff's Employment*

Plaintiff Donald Parker was hired by the MTA in 1963 as a railroad police officer on a predecessor company to the Metro–North Railroad, a position he continues to hold at the present time. Plaintiff was 68 years of age at the time Defendants filed their motions, and is the most senior police

officer in the Metro–North Division of the MTA Police Department. Plaintiff is currently represented by Defendant Metro–North Police Benevolent Association (i.e., "the Union"), and was represented by its predecessor unions throughout his employment.

### (a) *Plaintiff's Attempt to Gain Promotion to Sergeant*

During the first quarter of 1989, when Plaintiff was 58 years of age, Plaintiff took and passed the MTA's written examination for the position of sergeant. At the time, Plaintiff reported for duty in Poughkeepsie, New York. Plaintiff and the 28 other officers who passed the exam were placed on a sergeants promotion list as of May 22, 1989. Pursuant to the collective bargaining agreement ("CBA") in force between Metro–North and the Union, applicants on the promotion list were ranked according to their composite test scores, and were selected for promotion as vacancies became available, starting from the top of the list. Plaintiff's composite test score was 75, which ranked 26th out of the 29 applicants on the list. The CBA also provides that applicants who pass the exam may receive up to 10 points toward seniority. Plaintiff received the maximum 10 points.

At the time Plaintiff was placed on the list, he was the oldest police officer in the Metro–North Division. Between 1989 and early 1998, all of the officers on the promotion list, except for Plaintiff and one other applicant, were promoted to sergeant.

On November 24, 1990, the Union's Vice President, Defendant Robert Novy, filed a written grievance with the MTA contending that the seniority list violated the terms of the CBA. In particular, the grievance challenged the seniority date for those officers who had passed the 1989 sergeants examination. Plaintiff was named as one of the officers participating in the grievance. The MTA rejected this grievance, on the ground that, pursuant to

the CBA, the proper vehicle for challenging a seniority list is a "roster protest," which is distinguishable from a grievance under the CBA.

On January 16, 1991, Novy filed a roster protest, in which Plaintiff was named among the grieving officers, contending that the officers listed on the May 22, 1989 sergeants promotion list should be granted seniority as of the date those officers passed the examination. The MTA rejected the roster protest by letter dated May 29, 1992.

On October 31, 1991, Plaintiff underwent by-pass surgery, requiring him to miss work from the month of September 1991, or thereabouts, until December 13, 1991. When Plaintiff returned to his job, he was temporarily reassigned to "light duty" in Yonkers. This light duty included reporting to the Poughkeepsie station from his home nearby, picking up the railroad mail, bringing it to Yonkers, where Plaintiff did telephone and desk work, and returning to Poughkeepsie with the mail at the end of the day. In mid-January 1992, Metro–North's medical department cleared Plaintiff for regular duty, and Plaintiff returned to his Poughkeepsie work site. Plaintiff contends, however, that Defendants regarded him as disabled, due to his by-pass surgery, after his return to regular duty.

In December 1991, while Plaintiff was performing his "light duty" assignment, an MTA representative telephoned Plaintiff and orally offered him a sergeant's position in Grand Central Terminal, some 80 miles from Plaintiff's work site in Poughkeepsie. The CBA permits an officer to decline a promotion, without losing his seniority or standing on the promotion list, if the "reporting point" for the new position is located more than 30 miles from the officer's present reporting point. Accordingly, Plaintiff, who had previously reported to Poughkeepsie, declined the position at Grand Central, which is located more than 30 miles from Poughkeepsie.

When Plaintiff rejected the offered sergeant position, the assignment clerk who had called Plaintiff told him that his name would be taken off the sergeant promotion list. Plaintiff testified at his deposition that he understood from this conversation that Metro–North did not view the offered position as falling within the 30–mile rule. Specifically, Metro–North maintains that Plaintiff's reporting point, at the time he was offered the sergeant's position, was Yonkers, which is located within 30 miles of Grand Central Terminal. Plaintiff was not offered another sergeant position.

Plaintiff immediately contacted his Union representative, John Sisia, claiming that his name should not have been removed from the promotion list under the CBA's 30–mile rule. Plaintiff also complained to his commanding officer, Captain Joseph Greco. Plaintiff contends that these complaints amounted to oral grievances under the CBA, and that Metro–North failed to respond to those oral grievances. Metro–North, however, claims that Plaintiff filed no grievance concerning his removal from the promotion list at any time. The Union did not file a grievance on Plaintiff's behalf.

On August 12, 1994, Plaintiff made a roster protest to Metro–North over his exclusion from the 1994 sergeant seniority roster. Andrew J. Paul, Assistant Director of Labor Relations, informed Plaintiff by letter dated November 16, 1994, that Plaintiff was entitled to seniority only on the police officer roster. Paul testified that he did not recall signing the letter, and that he had no files or other documentation to support the determination that Plaintiff was not entitled to seniority on the sergeant roster. Plaintiff testified that he was aware he would not be placed on the sergeant seniority roster after receiving Paul's letter.

Plaintiff also testified that he presented an oral grievance to his union representative, Robert Hilkin, after receiving Paul's letter, but that Metro–North failed to respond to his grievance. Again, Metro–North contends to the contrary that Par-

ker did not file a grievance after receiving this letter.

### (b) The Promotion of James Lennon

Police Officer James Lennon took the sergeant's examination at the same time as Plaintiff. Lennon ranked 12th on the promotion roster, and received 9 points toward seniority. Lennon was offered a sergeant's position on June 9, 1992, but declined it, and was informed that his name would be taken off the promotion list because the offered position was located within 30 miles of Lennon's reporting location.

On June 24, 1992, Lennon filed a written grievance over the removal of his name from the promotion list. Lennon argued that Metro–North had violated a number of CBA provisions governing seniority and promotion in offering him a sergeant's position before offering it to others who already held seniority as sergeants.

Metro–North denied Lennon's grievance and appeal. In its letter denying the appeal, the Labor Relations Department relied upon an October 1998 Letter of Understanding, which amended the CBA by providing that seniority in a particular promotion grade was not effective until the date of actual promotion. Lennon's grievance eventually settled, on condition that Lennon be promoted to sergeant without back pay. Lennon was promoted to sergeant in May 1998.

Plaintiff complained about Lennon's promotion in a telephone call to Novy. Plaintiff testified that Novy responded, "you old fuck, keep your mouth shut, don't rock the boat, I got all I can do to keep you on this damn job," and told Plaintiff not to "take any action to get sergeant stripes just because Jimmy Lennon got them."

Plaintiff also claims that he was the subject of disparaging comments from other employees that were directed to his age and heart condition. Plaintiff testified that Sergeant Scott Bierce said to Plaintiff on various occasions, "are you still working, ain't you retired yet, for crying out loud," "how are you gonna perform your duties," "aren't you dead yet," and "why the hell don't you retire, you old bastard, what are you still doing here." Plaintiff also testified that Union Trustee–Delegate Robert Hilcken said to him, "why in the hell don't you retire," and that Sergeant Robert Turret, an Inspector Niland and Captain Alan Kenwood made similar remarks urging Plaintiff to retire. Hilcken was eventually reprimanded by Metro–North management for his comments to Plaintiff.

Sergeant Lennon gave similar testimony, stating that he heard several disparaging references to Plaintiff's age and health between 1989 and the present. For example, Lennon testified that a Captain Skopin told him that Plaintiff might be a danger to himself and to other officers due to his age. Lennon related similar comments from Hilcken, Niland, Kenwood, and a Sergeant Ferrett. In addition, Lennon testified that when he asked Novy why Plaintiff had not been promoted to sergeant, Novy responded, "Forget about Parker ... He's too old. I had to cut a special deal with [Director of Labor Relations] Ray Burney ... just to keep him working." Lennon further testified that an unidentified MTA Labor Relations Representative believed that Plaintiff should be promoted, but was told that Burney would not "go for that."

Finally, Plaintiff points out that he is the only police officer among the roughly 30 to 35 officers in the Seventh District, where he is assigned, who has not been provided training in use of the "Glock" pistol. All of the officers who have received Glock pistol training are younger than Plaintiff. Plaintiff contends that the failure to train him in use of the pistol constitutes age discrimination.

The CBA contains a non-discrimination clause, which provides that "there will be no discrimination against any officers because of race, color, creed, national origin or sex," but makes no provision for age or disability discrimination.

**(2)** *The Collective Bargaining Agreement*

**(a)** *The Sergeant's Examination and Promotions List*

Article 1 of the CBA governs seniority. Article 1, Section 1 sets forth three "seniority classes": lieutenants, sergeants, and police officers. Section 4 requires that seniority rosters of officers be revised and posted "at a place available to all officers." An officer has 30 days from the date his or her name first appears on the roster to file a protest with the Director of Labor Relations concerning the officer's seniority date, standing on the roster, or omission of his name from the roster.

Article 2 sets forth the procedures for promotions. Section 1 provides that officers must complete two years of service before they are eligible to take the test for promotion to sergeant. The test includes a competitive written examination and an oral examination before a review board consisting of a representative of the Chief of Police, an incumbent sergeant, and a neutral party chosen by agreement between the Union and Metro–North. Following the examination, the sergeants promotion list, consisting of names of officers who passed the examination, is posted. Successful candidates receive a maximum credit of 10 points for seniority, and their names are ranked on the promotion list on the basis of their composite test scores.

Article 2, Section 7 provides that promotions are offered as vacancies become available. When an advertised vacancy is not filled by a sergeant who already has seniority, the Police Department is required to notify the officer whose name appears at the top of the sergeants promotion list and offer him or her the job. If the officer does not accept the position, the Police Department removes the officer's name and offers the position to the next officer on the list.

An officer is not required to accept a vacancy located more than 30 miles from his or her "present reporting point," and will not lose his or her place on the promotion list or seniority if the officer declines to accept such a vacancy.

**(b)** *The Letter of Understanding*

The CBA was amended by a Letter of Understanding between the Union and Metro–North dated October 17, 1988. The Letter of Understanding provides that, with respect to the sergeants examination to be administered in January 1989, "[s]eniority in promotion grade shall not be established until the date of actual promotion to the rank of Sergeant." Defendants contend that the removal of Plaintiff's name from the promotion list was in accordance with the Letter of Understanding.

**(c)** *Claims and Grievances—Article 14*

Article 14 allows an officer or his Union representative to file a written grievance within 30 days of the occurrence on which his grievance is based. Plaintiff states in his brief that since July 11, 1992, the CBA's grievance clause allows grievances to be presented orally as well as in writing by an officer to his or her "Commanding Officer," but Plaintiff has provided no documents or other evidence of such an amendment. If Metro–North denies the grievance, it has 30 days to provide a written explanation of the reasons for the denial. The Union then has 30 days to appeal the denial to the Labor Relations Department.

If the Labor Relations Department denies the grievance, the Department has 30 days to issue a written statement of the reasons for the denial. The Union then has 30 days to request that an impartial arbitrator decide the matter, as provided under Article 30.

**(d)** *Impartial Arbitrator—Article 30*

Article 30 provides for the appointment of an impartial arbitrator, who has "exclusive jurisdiction over all final appeals in claims for compensation, discipline proceedings, or any dispute concerning the

interpretation of [the] Agreement." The arbitrator is compensated by the National Mediation Board.

### (3) *NYSDHR and EEOC Proceedings*

Plaintiff filed a charge of age and disability discrimination based on Metro–North's failure to promote him with the New York State Division of Human Rights ("DHR") and the Equal Employment Opportunity Commission ("EEOC") on September 16, 1998.

By letter dated December 2, 1998, Plaintiff's counsel requested a right-to-sue letter from the EEOC. By letter dated January 27, 1999, the United States Department of Justice notified Plaintiff that the EEOC had determined that it would "not be able to investigate and conciliate the charge within 180 days," and granted Plaintiff's request for a right to sue, authorizing him to file suit under the ADA within 90 days.

By letter dated February 5, 1999, Plaintiff's counsel requested that the DHR dismiss the DHR charge in light of his request for a right-to-sue letter from the EEOC. The DHR granted Plaintiff's request on the ground of administrative convenience.

### (4) *The Present Action*

Plaintiff filed the present action on April 27, 1999. Plaintiff claims that the MTA was motivated in whole or in part by his age in failing to promote him to sergeant. Plaintiff also contends that the Union ignored his complaints and grievances and refused to insist that the MTA promote him because of his age, and, after 1991, because of his disability. He further asserts that the Union Defendants agreed with Metro–North not to promote him because of his age and disability.

Plaintiff brings claims under (1) the ADA; (2) the ADEA; (3) 42 U.S.C. §§ 1981 and 1981a; and (4) NYHRL § 296. Plaintiff also seeks leave of court to amend his complaint under Fed.R.Civ.P.

15(a) by adding disparate impact claims against the MTA.

Defendants raise a number of arguments. The MTA contends that this Court lacks subject matter jurisdiction over Plaintiff's claims because (1) Plaintiff has not exhausted his administrative remedies; (2) Plaintiff's discrimination claims are preempted by the federal Railway Labor Act; and (3) each of Plaintiff's claims is untimely. The MTA further argues that the denial of training on the Glock pistol does not amount to adverse employment action and therefore does not support a discrimination claim.

The Union Defendants also argue that Plaintiff's claims are untimely, and further assert that (1) Plaintiff has failed to adduce evidence of age of disability discrimination by the Union or Robert Novy individually; (2) Defendant Novy cannot be liable as an individual under any of Plaintiff's claims; and (3) the ADEA does not permit the recovery of money damages against a labor organization such as the PBA.

For the reasons that follow, I agree with the MTA Defendants' argument that Plaintiff's claims against them are preempted, and grant summary judgment as to them. Summary judgment is also granted to Defendant Robert Novy on Plaintiff's ADA and ADEA claims against him individually. Summary judgment is denied, however, as to the remaining claims against the Union Defendants, in light of the triable issues surrounding the timeliness of Plaintiff's claims against them. Finally, I deny as futile Plaintiff's motion to amend his complaint.

## CONCLUSIONS OF LAW

### *Standard for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Moreover, where a case turns on the intent of the defendant, as employment discrimination claims do, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Services Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

(1) *Failure to Exhaust Administrative Remedies*

■ Metro–North argues first that this Court lacks jurisdiction over Plaintiff's claims, because the EEOC issued Plaintiff a right-to-sue letter before the expiration 180–day investigation period provided under the ADA. Metro–North contends that a discrimination plaintiff is barred from bringing an action in federal court prior to the expiration of the 180–day period. I reject this argument.

The ADA incorporates by reference the procedural requirements of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq. See* 42 U.S.C. § 12117. Title VII provides in pertinent part:

If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge ... the Commission has not filed a civil action ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within 90 days after giving such notice a civil action may be brought against the respondent named in the charge....

42 U.S.C. § 2000e–5(f)(1).

EEOC regulations permit the Commissioner to issue a right to sue notice upon a complainant's request before the expiration of the 180–day period. *See* 29 C.F.R. § 1601.28(a)(2). The validity of this regulatory provision is a matter of dispute among the courts, which are sharply divided on the question of whether section 2000e–5(f)(1) requires the passage of 180 days before the EEOC may terminate its investigation.

The Ninth and Eleventh Circuits have held that Title VII does not impose upon the EEOC a mandatory 180–day waiting period before issuing right-to-sue letters. *Sims v. Trus Joist MacMillan,* 22 F.3d 1059 (11th Cir.1994); *Saulsbury v. Wismer and Becker, Inc.,* 644 F.2d 1251 (9th Cir. 1980). The *Sims* Court summarized the grounds for its conclusion as follows:

(1) 29 C.F.R. § 1601.28(a) does not prohibit the EEOC from issuing an early right to sue notice prior to the expiration of a 180–day period; (2) the purpose of the 180–day period is to protect the aggrieved party from extended administrative proceedings or bureaucratic backlog; and (3) where the EEOC determines, due to its huge backlog, that it cannot investigate an aggrieved party's charge within the 180–day period and notifies the aggrieved party that it is terminating its investigative efforts, it is pointless for the aggrieved party to stand by and mark time until the 180–day period expires.

*Sims,* 22 F.3d at 1061. *See also Palumbo v. Lufthansa German Airlines,* 98 Civ. 5005, 1999 WL 540446 (S.D.N.Y. Jul.26, 1999); *Rosario v. Copacabana Night Club, Inc.,* 97 Civ.2052, 1998 WL 273110 (S.D.N.Y. May 28, 1998); *Figueira v.*

*Black Entertainment Television,* 944 F.Supp. 299 (S.D.N.Y.1996).

The leading case to take the contrary view is *Martini v. Federal Nat'l Mortgage Assoc.,* 178 F.3d 1336 (D.C.Cir.1999). There, the District of Columbia Circuit noted that the language of the statute "allows some flexibility in the timing of reasonable cause determinations," but determined that "the Commission's duty to investigate is both mandatory and unqualified." *Id.* at 1346. The Court went on to examine the legislative history of the statutory provision, observing that while the House version of what is now § 2000e–5(f)(1) authorized private actions after 180 days, the Senate version permitted private action after 150 days, and that the conference committee opted for the 180–day period. *See id.* at 1347 (citations omitted). Judge Tatel reasoned that "by choosing 180 days instead of 150 days, Congress indicated its belief that informal resolution of charges, even as late as the 180th day, would be preferable to allowing complainants to sue earlier." *Id.* Finally, the Court concluded that "the EEOC's power to authorize suits within 180 days undermines its express statutory duty to investigate every charge filed, as well as Congress's unambiguous policy of encouraging informal resolution of charges up to the 180th day." *Id.*

Several district courts have reached a similar conclusion. In *Rodriguez v. Connection Technology Inc.,* 65 F.Supp.2d 107 (E.D.N.Y.1999), the Court adopted the rationale of *Martini,* adding its own observation that the statutory language of § 2000e–5(b) states that the EEOC "shall make an investigation." From that provision that Court reasoned that "[t]he basic premise of 42 U.S.C. § 2000e–5(b) is that the principal duty of the Commission to investigate is both mandatory and unqualified, and is not to be given short shrift." *Rodriguez,* 65 F.Supp.2d at 111. *See also Stetz v. Reeher Enters., Inc.,* 70 F.Supp.2d 119 (N.D.N.Y.1999); *Olszewski v. Bloomberg, L.P.,* 96 Civ. 3393, 1997 WL 375690 (S.D.N.Y. Jul.7, 1997); *Pearce v. Barry Sable Diamonds,* 912 F.Supp. 149 (E.D.Pa. 1996); *Henschke v. New York Hospital–Cornell Medical Ctr.,* 821 F.Supp. 166 (S.D.N.Y.1993); *Wilk v. Intercontinental Hotel of New York,* 92 Civ. 2068, 1993 WL 88230 (S.D.N.Y. Mar.24, 1993).

In view of the well-known fact that the EEOC and state administrative agencies are so overwhelmed with charges that they could not possibly investigate more than a small fraction of them within 180 days, I find the *Sims–Saulsbury* line of cases to be the more persuasive. I therefore decline to grant Defendants' motions on the ground of failure to exhaust administrative remedies.

### (2) *Railway Labor Act Preemption*

The Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.,* requires arbitration of "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." § 153(i); *see also Mack v. Metro–North Commuter R.R.,* 876 F.Supp. 490, 492 (S.D.N.Y.1994) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987)). The intent of Congress in passing this statute was "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *See Buell,* 480 U.S. at 562, 107 S.Ct. 1410. To that end, the RLA requires arbitration of two classes of disputes. *See* 45 U.S.C. § 151a.

The first class consists of so-called "major" disputes, which concern the formation of collective bargaining agreements or efforts to secure them. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (citation omitted). The second class, "minor" disputes, includes "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Mack,*

876 F.Supp. at 492 (citing *Brotherhood of R.R. Trainmen v. Chicago River and Indiana R.R. Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)). In short, "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* (citations omitted). In this case, Defendants contend that Plaintiff's claims constitute a "minor" dispute.

In *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), the Supreme Court held that an RLA-covered employee's claim under state law is preempted by the RLA "where the resolution of a state-law claim depends on an interpretation of the CBA." *See id.* at 261, 114 S.Ct. 2239 (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)). On the other hand, if the claim does not require interpretation of the CBA, but rather, "involves rights and obligations that exist independent of the CBA," the state law cause of action is not preempted. *See Hawaiian Airlines,* 512 U.S. at 260, 114 S.Ct. 2239. Courts have applied the rationale of *Hawaiian Airlines* to employee claims under federal law. *See, e.g., Monroe v. Missouri Pacific R.R. Co.,* 115 F.3d 514 (7th Cir.), *cert. denied,* 522 U.S. 967, 118 S.Ct. 413, 139 L.Ed.2d 316 (1997); *Fry v. Airline Pilots Ass'n, Int'l,* 88 F.3d 831 (10th Cir.1996).

### (a) MTA Defendants

The MTA Defendants argue that the *Hawaiian Airlines* line of cases requires dismissal of Plaintiff's claims, because Parker's discrimination claims cannot be resolved without interpretation of the CBA by this Court. Specifically, Defendants note that Plaintiff's claims for discriminatory failure to promote are subject to the burden-shifting analysis of *Fisher v. Vassar,* 114 F.3d 1332 (2d Cir.1997). Hence, as an element of Plaintiff's prima facie case, Plaintiff will be required to demonstrate that he was qualified for the position of sergeant. Such qualification, Defendants contend, can only be determined with reference to the prerequisites for promotion set forth in the CBA.

Moreover, to rebut Plaintiff's assertion that he was qualified because he passed the sergeant's examination, Defendants state that they will demonstrate (1) that Plaintiff voluntarily disqualified himself by rejecting a position located within 30 miles of Yonkers, and thus, falling outside the CBA's 30–mile rule; and (2) that pursuant to the October 17, 1988 Letter of Understanding (which provides that seniority is not established until actual promotion to sergeant), Metro–North was justified in not placing Plaintiff's name on the sergeant seniority roster. Because these issues cannot be adjudicated without construction of these terms of the CBA, Defendants argue, Plaintiff's claims are preempted by the RLA. I agree.

Plaintiff responds by attempting to analogize the present case to *Lingle* and *Hawaiian Airlines,* in both of which the Supreme Court rejected arguments that state law causes of action were preempted under arbitration provisions in federal labor statutes.

In *Lingle,* the plaintiff had brought a retaliatory discharge claim under Illinois law alleging that she had been fired for bringing a workers' compensation claim. The district court dismissed her complaint, concluding that her claim was "inextricably intertwined" with a provision in her CBA prohibiting wrongful discharge or discharge without just cause, and thus preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Seventh Circuit affirmed the district court's ruling. The Supreme Court reversed, noting that the dispositive issues—i.e., whether the plaintiff had been discharged, and whether the employer's motive in discharging her was retaliatory—were "purely factual questions," neither of which "require[d] a court to interpret any term of a collective-bargaining agreement." *Lingle,* 486 U.S. at 407, 108 S.Ct. 1877.

The Court expressly applied the rationale of *Lingle* to its subsequent decision in *Hawaiian Airlines*. *See Hawaiian Airlines*, 512 U.S. at 260–63, 114 S.Ct. 2239. In that case, the plaintiff, a discharged airline mechanic, brought state law wrongful discharge claims against his former employer. In affirming the Hawaii Supreme Court's ruling that the plaintiff's claims were not preempted by § 151a of the RLA, the Court observed that "the RLA's mechanism for resolving minor disputes does not preempt causes of action to enforce rights that are independent of the CBA," *id.* at 256, 114 S.Ct. 2239—that is to say, causes of action that "can be resolved without interpreting the agreement." *Id.* at 262, 114 S.Ct. 2239 (quoting *Lingle*, 486 U.S. at 410, 108 S.Ct. 1877). As in *Lingle*, the determinative question was whether the employer's motivation in discharging the plaintiff was retaliatory—a "purely factual question" that could be decided without resort to the CBA. *See id.* at 266, 114 S.Ct. 2239.

*Lingle* and *Hawaiian Airlines* are plainly distinguishable from the instant case. Here, Plaintiff's case hinges upon a showing that Plaintiff was qualified for the position of sergeant, and that Metro–North's proffered reason for denying him that position—his non-compliance with the CBA's 30–mile rule—was pretextual. Neither one of these questions can be determined without interpretation by the Court of several provisions of the CBA, including Article 1, governing seniority, Article 2, which controls promotions, including the 30–mile rule, and the October 1988 Letter of Understanding. Thus, neither of the dispositive issues in this case involves rights that exist "independent of the CBA," as the Supreme Court construed that term in *Lingle* and *Hawaiian Airlines*.

For example, Plaintiff argues that because Metro–North's December 1991 offer of the sergeant's position was made to him over the telephone, and not in writing, as Article 2, Section 7 of the CBA requires, Metro–North's offer was not valid. An invalid offer, Plaintiff reasons, prevents the CBA from coming into play. His argument, however, only serves to underscore the necessity of interpreting the CBA in this case. Plaintiff cannot demonstrate that the offer was not valid without showing that the offer was for an "advertised vacancy" as provided under Article 2, Section 7. Moreover, whether or not the offer was valid under the CBA, Plaintiff must demonstrate that he remained qualified for a sergeant's position after he declined the offer in Grand Central Terminal, which requires him to demonstrate that his "present reporting location," as provided in the CBA was Poughkeepsie, and hence, that under the 30–mile rule, the offer was required to be for a position within 30 miles of Poughkeepsie, not Yonkers. Finally, Plaintiff cannot show that Metro–North's failure to include his name on the sergeant seniority roster was discriminatory without also showing that the 1998 Letter of Understanding required that his name be placed on the list, despite his having declined the offer for the Grand Central position. Plaintiff's own argument therefore compels the conclusion that his claims against the MTA Defendants are "inextricably intertwined" with interpretation of the CBA.

Several courts have reached similar conclusions in cases analogous to that at bar. *See, e.g., Audette v. Int'l. Longshoremen's & Warehousemen's Union*, 195 F.3d 1107 (9th Cir.1999) (breach of settlement agreement preempted by LMRA where plaintiffs claimed entitlement to registration as "Class B" workers under CBA); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485 (5th Cir.), *cert. denied*, 519 U.S. 864, 117 S.Ct. 171, 136 L.Ed.2d 112 (1996) (state discriminatory failure to train and retaliation claims preempted by LMRA); *Fry*, 88 F.3d 831 (RLA preempts nonstriking pilots' RICO and state law claims where court would be required to compare protections promised to pilots in labor agreements with actual conduct of employer).

For the foregoing reasons, I conclude that Plaintiff's ADA, ADEA and HRL claims against the MTA Defendants are preempted by Section 151a of the RLA.

### (b) The Union Defendants

The Union Defendants argue that Plaintiff's claims against them are preempted by the RLA as well. Plaintiff claims against the Union Defendants are based not on discriminatory failure to promote, but rather, on discriminatory breach of the Union's duty of fair representation. Although it is well settled that a union's breach of its duty of fair representation may render it liable for discrimination under Title VII and § 1981, *see Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), it is less clear whether such a breach may also expose the union to liability under the ADA or ADEA, a question that Plaintiff has neglected to brief.

 Although money damages are not available against labor organizations under the ADEA, *see Air Line Pilots Ass'n Intern. v. Trans World Airlines, Inc.*, 713 F.2d 940 (2d Cir.1983), *aff'd in part, rev'd in part sub. nom. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), at least one court in this circuit has recognized union liability under the ADA for breach of its duty of fair representation. *See Nweke v. Prudential Ins. Co. of America*, 25 F.Supp.2d 203, 220 (S.D.N.Y.1998). With respect to the ADEA, § 623(c)(1) of the statute provides that it is unlawful for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his age." Indeed, the Supreme Court in *Goodman* construed identical language in Title VII to allow breach of duty of fair representation claims under that statute. *See Goodman*, 482 U.S. at 667, 107 S.Ct. 2617. Moreover, § 623(c)(3) makes it unlawful for a labor organization "to cause or attempt to cause an employer to discriminate against an individual in violation of

this section." I therefore conclude that Plaintiff may state a claim for breach of duty of fair representation under both statutes, although he can recover damages only under the ADA.

The Union Defendants contend that Plaintiff's discrimination claims are preempted, citing *Snay v. U.S. Postal Service*, 31 F.Supp.2d 92 (N.D.N.Y.1998). In *Snay*, the Court cited the Supreme Court's observation in *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), that a union's duty of fair representation includes the duty to act "without hostility or discrimination ... [in] complete good faith and honesty ... to avoid arbitrary conduct." From this language the Court reasoned that state law claims are preempted by the LMRA if they "attempt to impose obligations on a union that are subsumed by this duty." *Snay*, 31 F.Supp.2d at 99. Thus, the Court concluded that the plaintiff's HRL claims against her union for gender and disability discrimination were preempted, since the obligation not to discriminate under the HRL was already imposed on the union under its duty of fair representation. Likewise, the Union Defendants argue, Plaintiff's fair representation claims under the ADA, ADEA, and HRL are "subsumed" within the Union's already extant obligation not to discriminate.

The holding in *Snay*, however, conflicts with the Supreme Court's determination in *Goodman* that fair representation claims are actionable under Title VII. The Supreme Court reached its decision in *Goodman* after its recognition in *Vaca* that the duty of fair representation includes a prohibition against discrimination. Clearly, then, *Vaca* does not dictate that the existence of a generalized obligation not to discriminate under the duty of fair representation results in the preemption of all other discrimination claims. To hold otherwise would render *Goodman* meaningless, since Title VII claims—which by definition invoke rights that also exist under the duty of fair representation—would be

preempted in every case. I therefore decline to conclude that Plaintiff's discrimination claims against the Union are preempted by the RLA.

### (3) *Statute of Limitations*

Both the MTA and Union Defendants next contend that Plaintiff's claims against them are time-barred. In New York, ADA and ADEA plaintiffs must file a charge with the EEOC within 300 days of the discriminatory act. *See* 29 U.S.C. §§ 626(d)(2), 633; 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e–5). The EEOC filing is a condition precedent to filing suit. *See Reich v. Dow Badische Co.*, 575 F.2d 363, 367–68 (2d Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

Under both of these statutes, the limitations period begins to run when the plaintiff knows or has reason to know of the discriminatory injury. *See Harris v. City of New York*, 186 F.3d 243 (2d Cir.1999); *Cornwell v. Robinson*, 23 F.3d 694 (2d Cir.1994); *Morse v. Univ. of Vermont*, 973 F.2d 122 (2d Cir.1992).

A discrimination plaintiff under N.Y. Executive Law § 296 must either file a charge with the NYSDHR within one year of the discriminatory conduct, or, commence a lawsuit within three years of the discriminatory conduct. *See* N.Y.Exec. Law § 297(5); *Koerner v. State, Pilgrim Psychiatric Center*, 62 N.Y.2d 442, 478 N.Y.S.2d 584, 467 N.E.2d 232 (1984). Here, Plaintiff filed a charge with the DHR on September 16, 1998. The one-year limitations period therefore applies to his HRL claims.

#### (a) *The MTA Defendants*

The MTA Defendants argue that the last date on which Plaintiff should have known that he would not be promoted to sergeant was November 16, 1994, when Plaintiff received the letter from the Labor Relations Department informing him that he would not be placed on the sergeant seniority roster. The MTA Defendants are correct. Plaintiff filed his charge of race and disability discrimination with the EEOC on September 16, 1998, more than 300 days after he knew or should have known of the injury.

Plaintiff responds by noting that the Labor Relations Department's determination that Plaintiff was not eligible for the sergeants promotion list letter is not supported by Metro–North files or other documentation. But whether or not the letter was accurate is beside the point. That communication put Plaintiff on notice that Metro–North would not promote him, whether its stated reason was founded or not, and thus, started the running of the limitations period.

Plaintiff next argues that he was subject to a continuing violation of his rights under the ADA and ADEA, and is therefore still permitted to bring his claim. Plaintiff correctly points out that there is a "continuing violation" exception to the normal accrual date for discrimination claims where "there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests." *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996). In that circumstance, the existence of a discriminatory practice or policy may delay the commencement of the statute of limitations period "until the last discriminatory act in furtherance of [such practice or policy]." *See Harris*, 186 F.3d at 248.

Plaintiff contends that the exception applies here, because he still has not been promoted, and thus, Defendants have continued to violate his rights under the ADA and ADEA up to the present day. The relevant case law, however, draws a clear distinction between the last act causing the discriminatory injury—here, the decision not to place Plaintiff on the sergeants seniority roster—and subsequent effects of that act. Indeed, Plaintiff's theory is precisely the type of extension of the continuing violation exception that the Second Circuit rejected in *Harris*.

In that case, one with facts very similar to those before me, the plaintiff, a police officer, brought claims under the ADA and Rehabilitation Act for failure to promote him to sergeant. The plaintiff had successfully completed the sergeants examination, and was placed on the sergeants promotion list, which expired on April 7, 1993. *See Harris*, 186 F.3d at 246. On August 31, 1994, he filed a disability discrimination charge with the EEOC, and the district court dismissed his statutory claims on the ground that his EEOC charge was untimely. *See id.* at 247.

Like Plaintiff in the present case, Harris argued that the violation of his rights was "continuing" because he still had not been promoted to sergeant as of the date he filed his EEOC charge. The Second Circuit dismissed this argument, concluding that "[e]ven if the Police Department engaged in a continuing violation by not promoting [the plaintiff] to sergeant, that violation ended when Harris' [promotion] list expired …, because after that date, the Department was no longer failing to promote him" due to his disability. *Id.* at 248.

Viewing the facts most favorably to Plaintiff, he knew that he was no longer eligible for promotion to sergeant on November 16, 1994, when the letter from the Labor Relations Department confirmed that Plaintiff was not on the sergeant seniority list. His EEOC charge, filed nearly four years later, clearly falls outside the 300–day statute of limitations.

Plaintiff attempts to distinguish *Harris* by arguing that the subsequent promotion of less senior officers constituted discrete discriminatory acts, and thus, brings Plaintiff's claims within the limitations period. *Harris* makes clear, however, that it is the decision not to promote that constitutes the discriminatory act, not the employment-related advantages that accrue to other employees as a result of that act. I reject Plaintiff's attempt to make an end-run around *Harris* by characterizing promotions of other Metro–North officers as further acts of discrimination, rather than

the effects of Metro–North's discriminatory failure to promote.

For the foregoing reasons, Plaintiff may not bring suit under the ADA, ADEA or HRL against the MTA Defendants.

### (b) The Union Defendants

Plaintiff contends that Metro–North and the Union agreed not to process the November 24, 1990 grievance, in which several officers, including Plaintiff, challenged the seniority date for officers passing the sergeants examination, because of Plaintiff's age and disability. He also claims that, for the same discriminatory reasons, the Union Defendants refused to urge or insist that the MTA promote him.

■ Article 14, subsection (a) of the CBA requires an aggrieved employee's union representative to file a grievance within 30 days from the date of the occurrence on which the grievance is based. Thus, the last point in time at which Plaintiff knew or should have known that the Union would take no action in furtherance of his promotion to sergeant was December 16, 1994, 30 days after Plaintiff received the November 16, 1994 letter from the Labor Relations Department denying his seniority roster protest. His ADA and ADEA charges were not filed until nearly four years later—well beyond the statute of limitations.

Plaintiff goes on to argue, however (for the first time at oral argument), that the Union committed a separate and timely act of discrimination when it arranged for Lennon to be promoted but failed to make the same arrangement for Plaintiff. Specifically, Lennon testified that, during a conversation with Novy in late 1997 or early 1998, in which Lennon expressed concern over Metro–North's failure to promote Plaintiff, Novy told Lennon to "forget about Donald Parker, he's too old." Novy then allegedly informed Lennon that he "had to cut a special deal" with Director of Labor Relations Ray Burney "just to keep [Plaintiff] working." (Lennon Dep.

at 17–18.) Lennon further testified that another Labor Department representative, Tony Conti, "was going to push for Donald Parker to be made sergeant," but told Lennon that "Burney would not go for that." (Id. at 19–20.)

Lennon further testified that Union Trustee–Delegate Hilcken, Sergeant Robert Turret, and Inspector Kenwood made remarks about Plaintiff's heart condition suggesting that Plaintiff was unable to perform his job. Specifically, Lennon stated that Kenwood "did not know why [Plaintiff] was still working and he thought that he could cause someone—injury to someone else by not being able to respond to a call, or cause some injury to himself if he was to be hit in the chest." (Id. at 23.) He also testified that Captain Skopin and Inspector Niland made similar comments, the "gist" of which was that "they were afraid for [Plaintiff] and they were afraid that he could possibly get hurt during the performance of duty due to the fact he had a bypass." (Id. at 24.)

■ Lennon's testimony raises a question of fact as to whether the Union breached its duty of fair representation vis-à-vis Parker on the basis of his age and perceived disability. While the record does not specifically indicate when Novy allegedly refused to press Plaintiff's case with Metro–North management, on this record a reasonable juror could conclude that it was within 300 days of the date Plaintiff brought his EEOC charge (given that Lennon was promoted in 1998).[1] Therefore, the Union Defendants' motion for summary judgment on statute of limitations grounds must be denied. However, this is the only aspect of his claim on which Plaintiff will be permitted to present evidence.

### (4) *Successor Liability of the MTA PBA*

The Union Defendants next point out that since August 1998, the MTA PBA has been a separate labor organization from the Metro–North PBA. On or about January 1, 1998, the Metro–North and Long Island Railroad Police Departments were disbanded and replaced by the MTA Police Department. (Declaration of Stuart Sanseviro at 2.) On August 10, 1998, the MTA PBA was recognized under Section 207 of the New York State Civil Service Law as the exclusive bargaining representative for MTA officers, including Plaintiff. (Id. at 3.) Because Lennon was promoted in March 1998, before the MTA began to represent Plaintiff, the Union Defendants argue that the MTA PBA could not have been a participant in any discrimination against Plaintiff, and thus, cannot be liable.

The Union Defendants have cited no case law or other authority on the question of successor union liability. The little case law that appears to exist on the issue indicates that successor labor organizations may be held liable for the discriminatory acts of their predecessors, according to the same factors used to determine successor liability of corporations. *See EEOC v. Local 638,* 700 F.Supp. 739 (S.D.N.Y.1988). Specifically, in concluding that a successor union could be liable under Title VII for the acts of its predecessor, the Local 638 Court considered: (1) the relationship between the predecessor and successor (for example, whether the successor was formed by a merger of the predecessor); (2) whether substantial continuity of assets and employees existed

---

1. The Union Defendants also argue that Plaintiff's claims are "hybrid" claims against his employer and union, and thus, subject to the six-month statute of limitations applicable to such claims. *See Heaning v. Nynex–New York,* 945 F.Supp. 640, 647 (S.D.N.Y.1996). Where a plaintiff brings claims under § 301 of the LMRA against an employer for violation of the CBA and against his union for breaching its duty of fair representation in connection with that violation, such claim is known as a "hybrid 301/fair representation" claim. *See id.* Here, Plaintiff has not asserted an LMRA claim against any of the Defendants. Therefore, I decline to classify his claims as hybrid claims for purposes of the statute of limitations.

between the predecessor and successor; (3) whether the successor had notice of the liabilities and obligations of the predecessor; and (4) the importance of the federal policies at stake. *See id.* at 741–45.

■ The Union Defendants have not adequately addressed any of these factors, but merely argue in conclusory fashion that because the MTA PBA did not come into existence until after Lennon was promoted, it cannot be liable for any discrimination by the Metro–North PBA. Clearly, the fourth *Local 638* factor weighs in favor of imposing successor liability on the MTA PBA. *See id.* at 746 ("The importance of equal opportunity needs little elaboration, being one of the most fundamental federal goals.") But having failed even to discuss the remaining three factors under the applicable case law, the Union Defendants are not entitled to summary judgment on Plaintiff's claims against the MTA PBA.

### (5) *Individual Liability of Robert Novy*

As the Union Defendants correctly point out, an individual defendant may not be liable under the ADEA. *See McKeever v. New York Medical College*, No. 96 Civ. 7066, 1999 WL 179376, *8 (S.D.N.Y. Mar.31, 1999) (citing *Smith v. Lomax*, 45 F.3d 402, 403–04 (11th Cir.1995); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir.1994); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587–88 (9th Cir.1993)). The same rule applies under the ADA. *See Menes v. CUNY City University of New York*, 92 F.Supp.2d 294, 305–06 (S.D.N.Y. 2000) (citations omitted). Plaintiff's ADA and ADEA claims against Novy individually are therefore dismissed.

Under the HRL, however, an individual defendant may be liable where that defendant "participates in the conduct that gives rise to a discrimination claim." *See Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522, 530 (S.D.N.Y.1998). Lennon's testimony raises a question of fact as to whether Novy participated in the Union's discrimination against Plaintiff as the Union official who made an agreement with Metro-

North not to pursue Plaintiff's promotion because of his age. Accordingly, summary judgment is denied as to Plaintiff's HRL claim against Novy.

### (6) *Inapplicability of 42 U.S.C. § 1981 as to Union Defendants*

Although a union may be liable for breach of its duty of fair representation under § 1981, that statute does not apply to this case, which does not involve racial discrimination.

Section 1981 provides in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

■ The purpose of § 1981, which was enacted as part of the Civil Rights Act of 1866, is to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination because of their ancestry or ethnic characteristics. *See St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Plaintiff has made no such allegations. Rather, his claims stem from alleged discrimination based exclusively on age and disability. Plaintiff's invocation of § 1981 is thus inapposite, and his claims under that statute are dismissed. *See Wyche v. Marine Midland Bank, N.A.*, No. 94 Civ. 4022, 1996 WL 125668, *4 (S.D.N.Y. Mar.20, 1996) ("It is elementary that Section 1981 ... does not apply to age discrimination claims, since by its terms it assures all individuals the rights enjoyed by 'white citizens' ").

### (7) *Leave to Amend*

Plaintiff claims that, after his counsel was provided with the MTA's police retirement plan during discovery, Plaintiff learned that he did not receive pension

credit for his service as a police officer for Metro–North or its predecessor companies, including Conrail, before 1983. Plaintiff contends that denial of credit under the plan amounts to discriminatory disparate impact, for which he seeks leave to amend his complaint under Fed.R.Civ.P. 15(a).

Before 1985, Metro–North employees were entitled only to those benefits provided under the federal Railroad Retirement Act, 45 U.S.C. § 201 *et seq.* Effective January 1, 1985, Metro–North established the Metro–North Commuter Railroad Defined Contribution Pension Plan for employees represented by a union, including police officers. Eligibility to retire under this plan was based on service with Metro–North only, not with its predecessor companies. Metro–North distributed a summary plan description to all current employees no later than 1989.

After the MTA police department was created by statute in 1997, the MTA established the Police Retirement Program, which covers all MTA police officers. Under that Program, incumbent Metro–North police officers received pension credit in the Police Retirement Program for all of their police service with Metro–North. The Police Retirement Program also provided for the transfer of pension contributions from the Metro–North Plan to the Police Retirement Program. The Police Retirement Program further provided that no police officers would receive a benefit less than the accrued benefit they had under the Metro–North Plan.

Because the Police Retirement Program provides credit only for employment by Metro–North, which did not come into being until January 1, 1983, Plaintiff cannot receive credit for his years of employment prior to 1983. Plaintiff contends that this limitation under the Program constitutes has a disparate impact upon Metro–North police officers over 40 years of age, and seeks leave to add a disparate impact claim against the MTA.

While district courts should "freely" grant leave to amend "when justice so requires," Fed.R.Civ.P. 15(a), a district court may deny such leave when the amendment would be futile. *See, e.g., Jones v. New York State Division of Military and Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

■ In this case, Plaintiff's proposed amendment would be futile because his disparate impact claim would be untimely. The MTA asserts that Plaintiff should have known that he would not receive credit for his pre–Metro–North employment in 1983, when the original MTA Police Retirement Program went into effect. Plaintiff does not dispute this assertion. Rather, he merely points out that his counsel did not obtain a copy of the Plan until late in discovery, which, of course, is irrelevant to the dispositive question of when *Plaintiff* first knew that he would not get credit. Furthermore, Plaintiff does not deny that he was provided with a copy of the summary plan description for the Defined Contribution Plan in 1989. Finally, the establishment of the Police Retirement Program in 1997 did not change the provision in the predecessor plan denying credit for pre–Metro North employment, and could not have led Plaintiff to believe reasonably that he had become eligible for pre–Metro–North credit. Because Plaintiff knew or should have known that he would not receive such credit in 1989 at the latest, Plaintiff's proposed amendment, relating back to the filing date of this action, April 27, 1999, is far beyond the 300–day statute of limitations under the ADEA and the applicable three-year statute of limitations under the NYHRL.

■ Moreover, even if Plaintiff's proposed amendment were timely, this court would lack jurisdiction to hear his disparate impact claim. In *Butts v. City of New York Dept. of Housing,* 990 F.2d 1397, 1401 (2d Cir.1993), the Second Circuit noted that a district court only has jurisdic-

tion to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge that is "reasonably related" to that alleged in the EEOC charge.

*Butts* recognized three situations in which new claims are "reasonably related" to the allegations in the EEOC charge: (1) where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) where the employee complains that the employer has retaliated for his having filed the charge; and (3) where subsequent discrimination has been carried out in the same manner as that alleged in the charge.

Applying *Butts* to the present case, only the first of these situations is relevant, and Plaintiff's EEOC charge plainly does not fit that criterion. His EEOC charge alleges that the MTA and the Union discriminated against him because of his age and disability by agreeing that Metro–North would not promote him to sergeant and denying training on a particular firearm. As the MTA notes, that charge makes no mention of Plaintiff's entitlement to pension benefits under the Police Retirement Program, and does not even remotely involve any discriminatory application of those benefits to Plaintiff. As such, Plaintiff's disparate impact allegations do not fall within the scope of the EEOC investigation of his discriminatory failure to promote claims. Because the allegations of Plaintiff's proposed amendment are not reasonably related to his EEOC charge, and he has not filed a separate EEOC charge for his disparate impact claim, this Court would lack jurisdiction over such claim.

For the above reasons, this Court finds that granting Plaintiff leave to amend his complaint would be futile. Leave to amend is therefore denied.

*Conclusion*

For the foregoing reasons, summary judgment is (1) granted as to the MTA Defendants; (2) granted as to Plaintiff's ADA and ADEA claims against Defendant Novy; (3) denied as to Plaintiff's remaining claims against the Union Defendants.

This constitutes the order and decision of the Court.