**Barbara BRYANT, Plaintiff,**

v.

**VERIZON COMMUNICATIONS INC., Communications Workers of America Local 1103 and Communications Workers of America, Defendants.**

**No. 05 CIV. 8112(CM).**

United States District Court, S.D. New York.

May 1, 2008.

---

Armani Baraka Scott, Scott & Mason-Kinsey LLP, Brooklyn, NY for Plaintiff.

Carrie Corcoran, Michael A. Kalish, Epstein Becker & Green, P.C., Amy S Young, Semel, Young & Norum, New York, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge.

### I. Introduction

In this action Plaintiff Barbara Bryant alleges race and gender discrimination on the part of her former employer, Verizon Communications (Verizon), and her national and local labor unions, the Communications Workers of America (CWA), and CWA Local 1103. Before the court are the summary judgment motions of Verizon and the Union Defendants.

For the reasons discussed below, the motions for summary judgment are granted.

### II. Background

#### a. *Parties*

Plaintiff Barbara Bryant is an African–American female who was employed for 27 years by Defendant Verizon and its predecessors. Def. Verizon R. 56.1 Stmt. ¶ 1.

Defendant Verizon Communications, Inc. is a telecommunications company in the business of providing phone and other communication services to a variety or corporate and individual customers. Compl. ¶ 2.

Defendant CWA is an international labor union representing workers in the telecommunications industry, including workers at Verizon. Def. Union R. 56.1 Stmt. ¶ 1

Defendant Local 1103 is a local union affiliated with CWA responsible for representing workers in Bryant's previous job title. *Id.* ¶ 2.

The relevant facts concern Plaintiff's employment at Verizon, including several incidents that led to Plaintiff's being disciplined and eventually terminated, and the Union Defendant's representation of Plaintiff during those disciplinary proceedings. The facts are undisputed, or presented in the light most favorable to Plaintiff.

b. *Plaintiff's work history and union representation*

Barbara Bryant began working for Verizon in 1978. From that time until 1997 she held a series of clerical positions. Def. Verizon R. 56.1 Stmt. ¶ 2.

In 1997 Bryant applied for "The Next Step Program," a special program bargained for by the union and Verizon. *Id.* ¶ 3. Employees in the Program receive special technical training, including one day a week of college courses. *Id.* ¶ 5. Participants in the Program take on the job title of Telecommunications Technical Associate (TTA) and are trained for a position as either a Field or Office Technician. *Id.* ¶ 4, ¶ 7.

Bryant was accepted into the Program in September of 1997. She became eligible when she passed an entry exam, and was selected in part due to her seniority at Verizon. *Id.* ¶ 3. Verizon selected Bryant to perform the duties of a Field Technician. *Id.* ¶ 7. Field Technicians work outdoors, installing and repairing Verizon's telephone lines. Besides the additional training the program provided, Bryant also began to receive a significantly higher salary than she had earned in her previous positions. *Id.* ¶ 4.

September 1997 also marked the beginning of Local 1103's representation of Bryant. Def. Union R. 56.1 Stmt. ¶ 4. Bryant had been represented by CWA through other locals since about 1985. Def. Union Mem. at 2.

In its capacity as representative, Local 1103 plays a crucial role in smoothing out employer/employee conflicts through the grievance system. Pursuant to the collective bargaining agreement (CBA) between Verizon and CWA, employee grievances are handled in a four-step process. Def. Union R. 56.1 Stmt. ¶¶ 5–8. At the first step, a local union representative grieves the employer action and represents the employee's interest in a meeting with the employer. If the union and the employer are unable to mutually resolve the grievance, it is appealed to a second step. At the second step, the Local again presses the employee's grievance. If the grievance is denied at the second step, the Local can then pass the appeal on to the National, who sits with Verizon at the third step. Finally, if no resolution is reached after the third step, the National can submit the matter to binding arbitration. The decision whether or not to arbitrate rests solely with the National.

c. *Plaintiff's difficulties as a technician*

Between 1978 and 1997 Bryant had few difficulties with her employer. However, Bryant began to struggle in the Next Step Program. During the six-month probationary period following her promotion, Verizon attempted to have Plaintiff returned to her clerical position because of the difficulty she was experiencing learning her new position. Verizon Ex. 7 at D 3070, Ex. 17 at 15–18. Due to the intercession of Local 1103, Bryant was able to remain in the Program. *Id.*

However, her problems continued. Performance evaluations from her time as a Telecommunication Technical Associate show that Plaintiff had difficulty learning the requisite skills and could not complete

jobs without assistance. Verizon Ex. 18 at D 873 (first half of 1998) ("Barbara is not able to work alone yet"); Verizon Ex. 16 at D 1474–79 (second half of 1998) ("Barbara is not qualified as a field technician yet," "Barbara does less than one job per day," "needs to show marked improvement [in problem solving] in order to show that she is capable of doing this job," "needs to improve in [technical proficiency], she is new in the field but behind others with the same time in title"); Verizon Ex. 20 at D 1199 (2001 evaluation) ("[Bryant] appears lost at work," "needs to learn all aspects of the job again and again," "has improved but is still not close to others in gang"). During her seven years as a technician, Bryant took frequent and lengthy leaves of absence, which, though authorized, contributed to Plaintiff's difficulties mastering her position. Verizon Ex. 19 (2000 evaluation) (Bryant not ratable due to lengthy absence); Verizon Ex. 38 (2002 absence record) (Bryant absent 51 working days, excluding 20 days vacation and 5 personal days); Verizon Ex. 39 (2003 absence record) (Bryant absent 219 working days, excluding 24 days vacation and 6 personal days).

In February 2001, after Bryant had been a Field Technician for four years, her supervisor Bill Damson and her union representative Vincent Gaiante met with Bryant to discuss her "inability to perform her every day tasks as a field technician" and her "lack of field knowledge." Verizon Ex. 26. During this discussion it was made clear to Plaintiff that, if she did not show improvement, further action or discipline might be necessary. Id. Bryant failed to improve, and in November 2001, she was given a warning and placed on Verizon's Service Excellence Plan. Ex. 28. After her union grieved, however, Verizon agreed to remove the warning. Verizon Ex. 30.

In 2002, Bryant was removed from the Next Step Program because of her failure to meet the Program's academic requirements. Verizon Exs. 32–34. In particular, Bryant was unable to maintain the required 2.0 grade point average. Id. Nonetheless, she was able to remain in the job title of Field Technician, and this enabled her to continue receiving a higher salary. Id. However, Bryant continued to struggle as a Field Technician. PL's Ex. 5 (2002 evaluation) ("Barbara seems lost at times [and] needs to improve," "Below group standard," "has gotten worse [in Quantity/Productivity]!!"); Verizon Ex. 40 (first half of 2003) ("unable to rate [Bryant's quality since] out sick since feb[.] But for the most part needs to improve," "needs improvement [in Quantity/Productivity]," "needs to improve [in Knowledge/Proficiency]," "needs to make more of an effort [in Problem Solving/Decision Making]," and "needs to get it together [in Administrative/Organizational Skills]."); Verizon Ex. 41 (October 2003 letter) (Bryant "appear[s] lost").

### d. Work time violations

The basis for Plaintiff's dismissal from Verizon was a series of alleged "work time violations." A work time violation occurs when a Field Technician fails to perform work during work hours, or fails to properly account for her time. Def. Verizon R. 56.1 Stmt, ¶ 29. Verizon does not tolerate such infractions and punishes them severely, because Field Technicians perform their duties off-site and without supervision, traveling alone from one job to the next. Id. ¶¶ 28–30.

Work time violations and the appropriate punishment for them was the subject of a 1986 Agreement between Verizon and the CWA. Id. ¶ 31; Def. Union R. 56.1 Stmt. ¶¶ 8–11. Under the 1986 Agreement, the discipline for a first work time

violation is a suspension of up to 30 days and a final written warning. If an employee with more than five years of employment at Verizon goes on to commit a second work time violation within two years, his/her employment is terminated. *Id.* ¶ 8. The 1986 Agreement also limits the union's right to arbitrate work time violations to the issue of whether or not a work time violation occurred. Def. Verizon R. 56.1 Stmt. ¶ 31.

### i. April 2001 incident

Plaintiff's first work time violation occurred at a job site in New Rochelle, New York, in April 2001. Plaintiff was assigned as a helper for an installation crew that included her self and two men, one of whom, Ronnie Bough, was African American. Verizon Ex. 2 (Bryant deposition) at 61–67. Plaintiff claims that she left the site at 12:15pm to retrieve some supplies at the request of her coworkers. When she returned at 2:00pm, her supervisor, Bill Damson, confronted her and informed her that she would be disciplined for being "off the job." Damson apparently took the position that, as a helper, she should not have gone for supplies, and that lunch could only be taken from 12pm to 1pm, unless he was notified. *Id.* at 64–71.

Bryant was punished according to the 1986 Agreement for a first work time violation, and received a written warning. Local 1103 grieved, arguing that this punishment was too harsh, and asked for the application of progressive punishment. At the second stage of the grievance procedure, Verizon agreed, and consented to reducing Bryant's punishment to a verbal, rather than a written warning, Verizon Exs. 51–52. Bryant testified that she understood in April 2001 that the union had "not won" her grievance. Decl. of Amy Young, Ex. H at 337–38. However, the violation did not count as one of the two "strikes" under the CBA work time provisions.

### ii. September 2001 incident

The next incident involved a pair of absences in the wake of the September 11, 2001 terrorist attacks. Although Bryant's college courses were cancelled, her work was not—but she failed to go to her job. Again, her union interceded and convinced Verizon to "let it slide" in light of national events. Bryant received no discipline for her absences. Verizon Ex. 55.

### iii. December 2002 incident

On December 6, 2002, Bryant was assigned a job at FBI headquarters in White Plains. After arguing with the customer, Plaintiff left the job unfinished at 2:30pm. At that point she called her supervisor, Bill Damson, to receive a new assignment. Damson told her she would have to contact dispatch to receive a new job. Bryant never spoke to dispatch and was unable to account for her time from 2:30pm to 4:30pm. Verizon Exs. 56–60.

Bryant claims that she attempted to contact dispatch, but was unable to get through. She did not contact her manager again that day, and her time card for the day does not indicate that she did any work after the FBI job. *Id.*

In response, Damson conducted an investigation into the incidents of that day. This included interviewing Bryant, visiting the FBI job site, and discussing the matter with the FBI customer. Damson also consulted with his supervisors concerning the proper discipline to impose. Ultimately, Bryant was cited for a first work time violation, and received a 10–day suspension and final written warning, indicating that if she committed a second work time violation within the next two years, she would be terminated. *Id.*

Local 1103 grieved the discipline imposed by Verizon, arguing that suspension was too harsh a punishment and that

Plaintiff should not be placed on final warning. After it was unsuccessful at the first and second steps, Local 1103 appealed the grievance to the National, which argued the grievance at its third step. Decl. of Kevin Sheil ¶¶ 5–7, Exs. A–C. Verizon again denied the grievance, and the National decided not to take the grievance to arbitration. Decl. of Richard Martini ¶ 17. Bryant was aware of the outcome of the grievance procedure by December 2003. Decl. of Amy Young, Ex. H at 347.

### iv. April 5, 2004 incident and plaintiff's termination

On the morning of April 5, 2004—less than two years after the December 2002 incident—Plaintiff was instructed by her acting supervisor, Bill Stumpf, to report to a Verizon garage in Fairview, rather than a different garage at County Center, where Plaintiff had previously begun and ended her work days. Verizon Ex. 62. The County Center garage is approximately a 15–minute drive from the Fairview garage. Reply Aff of Michael Kalish, Ex. H at 76–77.

That afternoon, Stumpf observed Plaintiff crossing the street away from the County Center garage, and then standing at a bus stop across the street, counting money. Stumpf allegedly observed Plaintiff at 4:05pm, 25 minutes before the end of her shift. Verizon Ex. 62.

Plaintiff's testimony on this score is internally inconsistent. At one point in her deposition, Plaintiff claimed not to have left work early at all. Verizon Ex. 2 at 248–49, 308. When asked about this incident at another deposition session, Plaintiff conceded that she may have gone to the deli around 4pm that day, because she had not taken lunch. Id. at 418–19. However, Plaintiff's hand-written time card for that day shows that she did not work from 12pm to 1pm, the hour allotted for lunch. Verizon Ex. 63. Plaintiff concedes that she did not request or receive permission to leave work to go to the deli. Verizon Ex. 2 at 419–20.

After seeing Plaintiff at the bus stop, Stumpf called his supervisor, Peter Niles, who told him to record everything. Verizon Ex. 62. Niles later launched an investigation into Plaintiff's whereabouts on April 5, as well as a number of other days that week. Verizon Ex. 64. This investigation included interviews with Bryant concerning her whereabouts, and a comparison of Bryant's answers with the documentation prepared by Stumpf. Id. Niles also consulted with Verizon's Labor Relations Department. Id.

At the conclusion of this investigation it was determined that Plaintiff had committed a work time violation on April 5. Id. As this was Plaintiff's second work time violation within two years, Verizon terminated Plaintiff's employment. Verizon Exs. 69–70. Verizon informed Bryant on May 17 that she was suspended for 10 days pending her dismissal. Id.

Local 1103 filed a grievance, claiming that Plaintiff's termination was without just cause. Decl. of Kevin Sheil ¶¶ 8–13. Union representative Mark Sheil requested a letter from Plaintiff outlining her version of the events of the week beginning Monday, April 5. Id. ¶ 10, Ex. D. Plaintiff's letter to the union claimed that she had not left work early, and that she had missed lunch on several occasions. Id. The letter did not indicate that Plaintiff had left early to go to the deli, as Plaintiff testified in her deposition in this action. Id.

At the first step grievance hearing, held May 18, 2004, Verizon informed the local union that Stumpf had observed Plaintiff away from work 25 minutes before the end of shift, at a location 15 minutes from where she was instructed to close her shift, and denied the grievance. Id. ¶ 11, Ex. E.

Verizon denied the grievance and upheld the punishment.

At the second step, Local 1103 argued that, even in light of the evidence against Plaintiff, the punishment given was too harsh. *Id.* ¶ 12, Ex. G. Because Verizon had provided the Local with Plaintiff's hand-written time sheet indicated that she had taken her lunch hour from 12pm to 1pm, the Local did not argue that Bryant was entitled to leave work early. *Id.* Verizon denied the grievance, and Local 1103 appealed the grievance to the third step. *Id.* ¶ 13, Exs. G–H.

The third step, held on June 18, was handled by the National. The National made arguments similar to those made at the second step, arguing that Verizon was dealing too harshly with Bryant, and that she should be given another chance. Decl. of Richard Martini ¶ 18, Ex. J. Verizon again denied the grievance. *Id.* The National decided not to arbitrate the issue, and so informed Plaintiff on July 14, 2004. *Id.* ¶ 19.

While her grievance was pending, Local 1103 sought new job opportunities for Bryant. On June 3, union representative Mark Sheil offered to pursue a job in Brooklyn, an offer Bryant refused. Decl. of Kevin Sheil ¶ 14. Between June 8 and June 15, Sheil offered to pursue a position in White Plains for Bryant, but again she was not interested. *Id.* Finally, in July 2004, after the grievance process had run its course and Plaintiff's termination had become final, Sheil negotiated with a Verizon subsidiary to secure Plaintiff job offers in Syracuse, New York, and Piscataway, New Jersey, *Id.* ¶ 15. Plaintiff rejected both offers. *Id.* Although the specific nature of these positions is not clear from the record, Defendants assert that the White Plains position would have allowed Plaintiff maintain her pay and pension band. Id. ¶ 14. Both the Syracuse and Piscataway positions would have allowed Plaintiff to maintain her seniority and receive similar pay. *Id.* ¶ 15.

### e. *Working conditions and alleged retaliation*

Plaintiff argues that she was discriminated against in the assignment of equipment and jobs. Plaintiff alleges that she often had to go without necessary tools and equipment. For instance, Plaintiff claims that she went without a belt and a buzzer of her own, and was forced to borrow such equipment from her coworkers. Cmpl. ¶ 8.

As to job assignments, Plaintiff testified in her deposition that she was often assigned alone to two man locations, and to dangerous locations "in the projects," though she is unable to recall where those locations were specifically. Verizon Ex. 2 (Bryant deposition) at 705, 731–33.

Finally, Plaintiff alleges that, in October of 2003, she refused to be transferred or reassigned out her position. Plaintiff alleges that the adverse treatment she suffered, including her termination including her termination the following spring, was in retaliation for this refusal.

### f. *Procedural history*

On September 21, 2004, Plaintiff filed charges against CWA with the National Labor Relations Board (NLRB) on the basis of the National's decision not to arbitrate her termination, alleging that the union had breached its duty of fair representation. Decl. of Amy Young, Ex. C. The NLRB dismissed the charge, finding that the union had acted reasonably and in good faith. *Id.* Ex. F.

Plaintiff filed charges against Verizon with the EEOC on February 11, 2005, alleging that she was discriminated against because of her race and gender. *Id.* Ex. B. These charges were not pursued by the EEOC, and Plaintiff received her Right to

Sue letter on June 21, 2005. *Id.* Plaintiff did not file EEOC charges for Title VII violations against the Union Defendants. *Id.*

Plaintiff filed her complaint on September 20, 2005, alleging that Verizon had discriminated against her because of race and gender, in violation of Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law (HRL). Plaintiff alleges discrimination in her termination, her work and equipment assignments, and claims that Verizon retaliated against her for refusing to transfer out of her position on October 2003.

Plaintiff also alleges that her local union, 1103, and the national union, CWA, violated their federal common law duty of fair representation (DFR) to her by mishandling her grievances and failing to take her termination to arbitration. She also appears to allege violations of the HRL against the Union Defendants, arguing that the deficient representation was "because of" her race and gender.

The Union Defendants moved together for summary judgment on December 11, 2007. They argue that the statute of limitations has run on Plaintiff's DFR claims, and that Plaintiff's state law claims are preempted by federal law. Alternatively, the Union Defendants argue that Plaintiff's substantive claims are without merit.

On December 21, 2007, Defendant Verizon moved for summary judgment. Verizon argues that Plaintiff failed to establish a prima facie case of discrimination, and that even if she had, she has not shown the Verizon's proffered non-discriminatory reasons for disciplining and terminating her are pretextual.

### III. Discussion

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The party moving for summary judgment is initially responsible for demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim. The non-moving party is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

"[The Second Circuit has] repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir.2008) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110(2d Cir.1997); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)). Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224.

Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a mo-

tion for summary judgment. *See Meiri*, 759 F.2d at 998. "Summary judgment remains available for the dismissal of claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997).

The separate motions of the Union Defendants and Verizon will be treated in turn.

## UNION DEFENDANTS

### a. *The Union Defendant's motion for summary judgment is granted*

Bryant complains that the Union Defendants violated their duty of fair representation to her, and violated the New York State Human Rights Law, N.Y. Exec. Law § 296. Defendants argue that (1) the former claims are time-barred, and (2) the latter claims are preempted by § 301 of the Labor Management Relations Act, or are without a basis in the evidence. Defendants are correct on both counts.

### i. *Plaintiff's duty of fair representation (DFR) claims are time-barred*

Plaintiff claims that the Local did not do enough during the first two steps of the grievance procedure to contest Verizon's allegations, thereby breaching its duty of fair representation. The first grievance that Plaintiff alleges was not handled properly concerned the April 2001 incident in New Rochelle. The second grievance Plaintiff alleges was mishandled concerned the December 6, 2002 incident. The third grievance Plaintiff alleges was mishandled concerned her discharge in April 2004. Plaintiff argues that Local 1103 breached its duty in all these grievances by failing to "fight harder." Decl. of Amy Young, Ex. H at 430–33.

Plaintiff's claim against the National concerns its unwillingness to take the final grievance (the one that resulted in her termination) to arbitration. *Id.*

DFR claims are governed by a six-month statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Plaintiff's claims began to accrue when she knew or should have known of the act by which the union allegedly breached its duty. *Cohen v. Flushing Hosp. and Med. Ctr.*, 68 F.3d 64 (1995); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir.1989) ("[A] breach of duty by the union is apparent to the member at the time she learns of the union action or inaction about which she complains.").

Plaintiff's claims, to the extent they are premised on the union's duty to fairly represent her, are time-barred.

As to the April 2001 grievance—which actually succeeded in reducing her written warning for a work time violation to a verbal warning—it is undisputed that Plaintiff knew of the outcome of the grievance proceeding within a month. Therefore, Plaintiff knew or should have known of any act by which the union allegedly breached its duty more than six months prior to the commencement of this action on September 20, 2005.

As to the grievance related to the December 6, 2002 incident, it is undisputed that Plaintiff knew of the outcome of the grievance proceedings by at least December 2003. Therefore, Plaintiff knew or should have known of any act by which the union allegedly breached its duty more than six months prior to the commencement of this action on September 20, 2005.

As to the grievance related to her discharge, it is undisputed that Plaintiff learned of the outcome, and the national union's decision not to arbitrate, on July 14, 2004. Therefore, Plaintiff knew or should have known of any act by which the union allegedly breached its duty more

than six months prior to the commencement of this action on September 20, 2005.

Plaintiff's only response is to suggest that the court apply the three-year statute of limitations for violations of the New York State Human Rights Law to her DFR claims. That is not the law.

Therefore, Plaintiff's claims against the Union Defendants for violating its duty of fair representation are dismissed as time-barred.

 ii. *Plaintiff's New York State Human Rights Law (HRL) claims must be dismissed because plaintiff has failed to raise a genuine issue of material fact*

Plaintiff argues that the Union Defendants violated state anti-discrimination law when it failed to pursue her grievances with the necessary zeal. Plaintiff did not bring this claim under federal law (Title VII), and because she has not exhausted administrative remedies with respect to the Union Defendants, she cannot do so now.

Defendants argue that, in order to decide the state law cause of action, the court must interpret the CBA between Verizon and the union, so Plaintiff's state law claims are preempted by § 301 of the Labor Management Relations Act (LMRA). Alternatively, both the Local and the National contend that Plaintiff has failed to raise a genuine issue of fact supporting her discrimination claim.

 1. Preemption

■ "The Supreme Court of the United States has long held that Section 301 gives federal courts jurisdiction over controversies involving collective bargaining agreements [CBAs]." *Zuckerman v. Volume Servs. Am., Inc.,* 304 F.Supp.2d 365, 368 (E.D.N.Y.2004) (Wexler, J.) (citing *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)).

The importance of uniformity in the interpretation of CBA led the Court to hold that such claims must be decided under a single body of federal law. Therefore, any attempt to adjudicate § 301 claims under state law is preempted. *Id.* at 368–69 (citing *Textile Workers,* 353 U.S. at 455–56, 77 S.Ct. 912) (other citations omitted). Thus, a "state rule that purports to define the meaning or scope of a term in a contract suit is ... preempted by federal law." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

■ A few courts in this Circuit have held that a HRL claim seeking to impose on a labor union the obligation not to discriminate against its members is preempted by the federal common law duty of fair representation in every case, because the obligation not to discriminate is subsumed under the federal duty as articulated under *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842(1967) ("A breach of the ... duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."). *See e.g., Agosto v. Corr. Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 310 (S.D.N.Y.2000) (stating that "state law claims are preempted if they arise out of or are encompassed by a breach of the [DFR]" and holding that a HRL claim against a union defendant is preempted by the DFR); *Rodolico v. Unisys Corp.,* 96 F.Supp.2d 184, 187–88 (E.D.N.Y.2000) (DFR preempts HRL); *Snay v. U.S. Postal Serv.,* 31 F.Supp.2d 92, 99 (S.D.N.Y.1998) (same). However, this court specifically rejected this position in *Parker v. Metropolitan Transportation Authority,* 97 F.Supp.2d 437, 448–49 (S.D.N.Y.2000), reasoning that Supreme Court precedent regarding actions under Title VII makes it clear that

discrimination claims are not necessarily subsumed under the DFR. The Second Circuit has not addressed the issue.

The Union Defendants have not argued that the HRL claim is preempted by the DFR claim, so I see no need to revisit my opinion in *Parker*.

■ In *Allis–Chalmers*, the Court held that a state court action for bad faith handling of an insurance claim involved interpretation of a CBA and was therefore preempted by federal labor law. 471 U.S. at 218, 105 S.Ct. 1904. Although the Court made clear that claims involving contract interpretation are preempted, the Court also stated that "not every dispute concerning employment, or tangentially involving a provision of a [CBA], is preempted...." *Id.* at 210, 105 S.Ct. 1904. Instead, the question is whether the determination of the state law claim is "inextricably intertwined" with construction of the terms of the labor agreement. *Id.* at 213, 105 S.Ct. 1904.

■ In *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) and *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994), the Court emphasized that the focus in a § 301 preemption analysis is not the facts underlying a plaintiff's claim, but whether interpretation of a CBA is central to the dispute to be adjudicated.

In *Lingle*, the Supreme Court disagreed with lower court holdings that focused on the facts to be decided. The Court made clear that the presence of facts that overlap plaintiff's claim and collective bargaining claims does not require dismissal on preemption grounds. "Even if dispute resolution pursuant to a[CBA], on one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is independent of the agreement for § 301 preemption purposes." *Lingle*, 486 U.S. at 409–10, 108 S.Ct. 1877 (internal quotations omitted).

In *Livadas* the Court noted that, "the bare fact that a[CBA] will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas*, 512 U.S. at 124, 114 S.Ct. 2068. Thus, it held that the "simple need" to refer to the CBA to determine plaintiff's wages did not require a holding of preemption. *Id.* at 125, 114 S.Ct. 2068. The Supreme Court has "underscored the point that § 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." *Id.* at 123, 114 S.Ct. 2068.

■ "The Second Circuit has recognized that the starting point in determining whether a claim is preempted by Section 301 is consideration of the elements of plaintiff's stated claim." *Zuckerman*, 304 F.Supp.2d at 370 (citing *Foy v. Pratt & Whitney Group*, 127 F.3d 229, 233 (2d Cir.1997)). The court then considers whether adjudication of any element of that claim requires interpretation of the parties' CBA. *Id.* Where plaintiff's claim can be determined without construing the terms of the CBA, the state claim may proceed. The fact that a CBA must be consulted or referred to when deciding a claim does not necessarily lead to the conclusion that the claim is preempted. *Id.*

In *Wynn v. AC Rochester*, 273 F.3d 153 (2d Cir.2001), the Second Circuit held Plaintiff's state law claims of fraud and misrepresentation were not preempted by § 301. As in *Foy*, the court recognized that resolution of plaintiff's case would require reference to the collective bargaining agreement. *Wynn*, 273 F.3d at 158. Such reference, however, did not amount to an interpretation of the CBA. *Id.* Since plaintiff's claims turned mainly on the behavior and motivation of the employer, and not on

interpretation of the meaning of the parties' labor agreement, the court held plaintiff's claims were not preempted by § 301. *Id.* at 158–59; *see also Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 40 (2d Cir.1997) (claims for breach of contract and fraud did not require interpretation of CBA and hence were not preempted by § 301).

"As stated by the Second Circuit, 'the boundary between claims requiring interpretation of a[CBA] and ones that merely require such an agreement to be consulted is elusive.'" *Zuckerman*, 304 F.Supp.2d at 371 (quoting *Vera v. Saks*, 335 F.3d 109, 115 (2d Cir.2003)). Perhaps as a result, "Lower courts have applied the principles set forth by the Supreme Court and the Second Circuit with varying results." *Id.* (citing *Gray v. Grove Mfg.*, 971 F.Supp. 78, 84 (E.D.N.Y.1997)). Preemption has been found where plaintiff's state law claim disputes the validity of a provision in a CBA. Cases refusing to hold state law claims preempted include those alleging defamation, intentional infliction of emotional distress and tortious interference with contract, see *Shannon v. MTA Metro–North Railroad*, 952 F.Supp. 177, 180–81 (S.D.N.Y.1997), claims of negligence and negligent supervision, see *Brown v. National Football League*, 219 F.Supp.2d 372, 389–90 (S.D.N.Y.2002), and claims of age discrimination in violation of the New York HRL, see *Zuckerman*, 304 F.Supp.2d at 371.

To determine whether Plaintiff's state law claims are preempted, the court must begin by analyzing the elements of the state claim, in order to see if their determination will require an interpretation of the CBA, or whether those elements will merely refer to, but not require interpretation of, the CBA. *Foy*, 127 F.3d at 233.

■ Plaintiff's claims are brought under the New York State Human Rights Law (HRL), N.Y. Exec. Law § 296.

Courts in the Second Circuit apply the same analysis to claims under HRL and Title VII. *See, e.g., Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir.1999) ("Because New York courts require the same standard of proof for claims brought under the HRL as for those brought under Title VII, we analyze these claims in tandem.") (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995)).

It has been uniformly held that, in order to make her discrimination claim against the Union, Plaintiff must first establish that the Union Defendants breached their duty of fair representation. *Ross v. Commc'n Workers of Am.*, 1995 WL 351462, at *5 (S.D.N.Y. June 9, 1995) ("In order to establish a Title VII claim concerning representation by a union of its members' interests, 'it is axiomatic that ... there must first be a finding that the [union] breached its duty of fair representation.'") (quoting *Martin v. Local 1513 and District 118 of the Int'l Ass'n of Machinists and Aerospace Workers*, 859 F.2d 581, 584 (8th Cir.1988)) (alterations in original); *see also Tabois v. CWA Local 1101*, 1992 WL 131038 at *4 (S.D.N.Y. June 1, 1992) (stating that where plaintiff claimed the defendant union violated Title VII by failing to represent him fairly in the grievance process because of his sex, race, and national origin, "a finding of a dfr [duty of fair representation] breach [is] essential to the existence of the Title VII claim.") (quoting *Shaw v. General Motors Corp., Chevrolet–Tonawanda Div.*, 1991 WL 155581, 138 L.R.R.M. (BNA) 21185, 2188 (W.D.N.Y. Aug. 5, 1991)); *Dolittle v. Ruffo*, 1990 WL 2648, 51 Fair Empl. Prac. Cas. (BNA) 1790, 1792–93 (N.D.N.Y. Jan.16, 1990) (explaining that plaintiff's must show that the union defendants breached their duty of fair representation before prevailing on claim that union violated Title VII by failing to follow through on plaintiff's grievance).

■ Defendants argue that, in order to establish a breach of the DFR relating to the prosecution of an employee grievance in this case, Plaintiff must first establish a breach of the CBA by the employer. Not all courts have accepted this argument—*Compare Ross*, 1995 WL 351462, at *6 (citing with approval Seventh Circuit's *Bugg* test, which requires in such cases that plaintiff show, *inter alia*, that the employer committed a violation of the CBA with respect to plaintiff), *with Agosto*, 107 F.Supp.2d at 303–05 (collecting cases applying the *Bugg* test and its variations, but ultimately concluding that employer breach of the CBA is not necessary to establish a Title VII claim against a union)—even where a plaintiff's claim could be characterized as a so-called hybrid § 301/DFR claim. "Although formally comprised of two separate causes of action, a suit in which an employee alleges that an employer has breached a CBA and that a union has breached its duty of fair representation by failing to enforce the CBA is known as a hybrid § 301/fair representation claim." *Acosta v. Potter*, 410 F.Supp.2d 298, 308 (S.D.N.Y.2006) (internal citations omitted). "To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a[CBA] and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178–79 (2d Cir.2001).

In this case, the Union Defendants argue that, even in the absence of this label—and the additional element (employer breach) it brings with it—the Defendants' liability under the HRL depends integrally on the issue of whether or not Verizon had a strong case, i.e., was justified under the contract, for disciplining and eventually terminating Plaintiff. Defendants argue that, in order to make that determination, it will first be necessary to determine whether or not any "work time violations"

occurred. Defendants thus conclude that the court will have to interpret the CBA.

But it is not necessary to determine whether or not Verizon breached the CBA in order to determine whether or not the Union Defendants discriminated against Bryant. This is so because it is possible for the union to discriminate against its members even when the employer acts within its rights. For instance, Plaintiff could simply concede that Verizon was within its rights to terminate her, but argue that the union nonetheless represented her interests less zealously than it represented other members who faced the same punishment for the same infractions, and that the difference in representation was "because of" her race or gender.

The availability of such a theory makes it clear that the claim of *discrimination* does not necessarily require interpretation of the CBA. If Plaintiff proves that she was treated less favorably than others because of her race and/or gender without any need for interpretation of the contract, then the claim is not preempted. *See Zuckerman*, 304 F.Supp.2d at 371–72 (analogizing to *Foy* and *Wynn*, and holding that because the crucial issue in determining plaintiff's state law discrimination claim was defendant's motivations, the claim was not preempted). The right to be free from such discrimination arises from state law, not from the CBA, and it is a non-negotiable right. *Livadas*, 512 U.S. at 123, 114 S.Ct. 2068 (§ 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law"). Hence, § 301 should not be read broadly to preempt the HRL in this case.

Implicit in this conclusion is my rejection of those cases that hold that a finding of employer breach of the CBA is necessary in every Title VII/HRL claim against a union for failure to carry out a grievance.

Also implicit is my refusal to apply the "hybrid § 301/DFR" label to Plaintiff's claim. Defendants did not so describe the claim in the briefs, and I will not go out of my way to apply a label to Plaintiff's claim that would be fatal to that claim in the absence of a compelling reason to do so.

I therefore conclude that Plaintiff's claim under the HRL is not necessarily preempted by § 301.

However, any argument made by Plaintiff that would require interpretation of the CBA is foreclosed, since this court cannot engage in such interpretation. *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). To the extent that Plaintiff's state law claim against either Defendant rests on such an argument, her claim is preempted. As will be seen, Plaintiff's claim against the National suffers from this particular defect.

### 2. Merits

To survive summary judgment on the Union Defendants' motion to dismiss her discrimination claim, Plaintiff must raise a genuine issue of material fact on both of the following questions: (1) Did the union violate its DFR? (2) If so, was its violation motivated by Plaintiff's gender or race?

Plaintiff has failed to raise a genuine issue of fact on either issue. The claims against the local and national unions are treated separately below.

### a. Local 1103

Local 1103 was empowered only to pursue Plaintiff's grievances through the first two stages of the grievance process. Therefore, the only basis of liability alleged by Plaintiff is the handling of her three grievances up to the time that they were appealed to the National union.

#### i. DFR

■ A union breaches its duty of fair representation when its conduct towards a member is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). A union's actions are arbitrary only if, "in light of the factual and legal landscape at the time of [its] actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). A union acts in bad faith only when the intent, purpose, or motives for its actions are improper, including fraud, dishonesty, or intentionally misleading conduct. *Spellacy v. Airline Pilots Ass'n, Int'l*, 156 F.3d 120, 126(2d Cir.1998).

■ The conduct complained of is the handling of Plaintiff's three grievances. "With respect to a union member's grievances, a union 'may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion.' " *Ross*, 1995 WL 351462, at *9 (quoting *Vaca*, 386 U.S. at 191, 87 S.Ct. 903). However, it has also been held that:

> [E]very union decision which may in some way result in overriding the wishes or disappointing the expectation of an individual employee, or even an appreciable number of employees, does not in and of itself constitute a breach of the fiduciary duty of fair representation.... Thus, where the union, after a good faith investigation of the merits of a grievance, concludes that the claim is unsubstantial and refuses to encumber further its grievance channels by continuing to process the unmeritorious claim, its duty of fair representation may well be satisfied.

*Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. NLRB*, 368 F.2d 12, 17 (5th Cir.1966), *cert. denied*, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).

■ Negligence or "tactical errors" on the part of the union are insufficient to show a breach of the DFR. *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43–44 (2d Cir.1989) (also stating that "[a]s long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage.") (quoting *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 645 (2d Cir.1985). *cert. denied*, 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929(1986)).

There is no evidence in the record before me that the Local breached its duty of fair representation.

■ As to the April 2001 grievance, Local 1103 contested Verizon's issuance of a written warning for a work time violation, and succeeded in having it reduced to a verbal warning. Had it not, Plaintiff would have been subject to dismissal in December 2002, when she committed a work time violation. Plaintiff does not suggest what more the Local could have done, or offer any evidence tending to show that the Local's handling of the matter bordered on the irrational, or was motivated by any discriminatory animus. Her "understanding" that the Local did not "win" the grievance is (a) wrong, and (b) insufficient to raise a genuine issue of fact.

Plaintiff argues that the Local's conduct of her grievances was perfunctory, and that the Local put more work into the grievances of other members. However, Plaintiff fails to provide any evidence in support of her conclusory allegations with respect to the April 2001 grievance. She won the grievance. She has nothing to complain about.

As to the December 2002 incident: the Local grieved Verizon's issuance of a written warning for a work time violation allegedly occurring on December 6, 2002. After Verizon denied the initial grievance, the Local appealed it to the second level. After the grievance was denied again, the Local, having taken the grievance as far as it was able under the CBA, passed it up to the National.

At each stage, the record reveals that Local presented Plaintiff's version of the facts to Verizon, and argued that Plaintiff's punishment was too harsh and should be reduced.

Plaintiff offers no evidence suggesting how the Local's handling her December 2002 grievance was arbitrary, discriminatory, or carried out in bad faith. Again, Plaintiff merely asserts that the union should have done more (without saying what it is the Local did not do), and that the union treats other members differently than it treated her (without providing any evidence that this is so). Plaintiff essentially asserts that the Local's "heart wasn't in it." Plaintiff offers no evidence for this proposition, other than the fact that she lost. That is not enough.

With respect to the grievance filed after Plaintiff was notified of her termination for a second work time violation in two years (April 2004 grievance), Local 1103 pursued the grievance at the first two levels, which is as far as it is able to proceed under the CBA. Again, at each stage, the Local presented Verizon with Plaintiff's version of the facts, and argued that termination was too harsh a punishment. The Local could not argue that Plaintiff was justified in leaving early work because she had not taken a lunch break, since Plaintiff's own hand-written time sheet indicates that she was not working during the regular lunch hour, 12pm to 1pm. Thus, the Local was limited to arguing either that Stumpf was lying or mistaken when he identified the Plaintiff—an impossible argument, since Plaintiff does not deny being away from work at the time Stumpf claims to have

seen her—or that Verizon should not stand on its contractual right under the CBA to terminate Plaintiff for two work time violations in a two-year period. The Local made the latter argument; Verizon was not persuaded.

There is simply no evidence that anything Local 1103 did or did not do was even remotely arbitrary, discriminatory, or tinged with bad faith. Instead, it appears the Local did everything in its power to convince Verizon not to terminate the Plaintiff on the basis of the April 5, 2004 incident. Plaintiff's bare, conclusory assertion that the union's representation was perfunctory is unsupported by any evidence.

The Local, by contrast, not only offered evidence that it grieved the challenged grievances as far as it was able, but also submitted evidence of a number of other actions it took on Plaintiff's behalf throughout her time in the Next Steps Program. The Local also presented evidence of its role in allowing Bryant to remain a TTA during the probationary period when Verizon sought to have her demoted. In July 2002, Local 1103 was successful in removing a written warning from Plaintiff's records on the basis of her repeated failure to close out her jobs. Barca Decl. ¶ 8, Ex. B. Finally, even after Plaintiff's termination, the Local union attempted to secure her a new job—although Plaintiff repeatedly refused the Local's assistance. This extensive evidence of diligent representation further underscores the total dearth of evidence that Plaintiff was ever treated in a discriminatory fashion by Local 1103.

#### ii. Discrimination

The undisputed facts establish, as a matter of law, that Local 1103 did not breach its duty of fair representation. Thus, it could not have breached its duty "because of" Plaintiff's race or gender.

However, even had Plaintiff raised a jury issue on the DFR element of her HRL claim, she has presented no evidence that she was subjected to discrimination in any fashion at the hands of the Local. Plaintiff can point to no evidence tending to show that the Local treated whites, or men, any differently than it treated her. She has presented no evidence of discriminatory remarks by any union official, or any discriminatory policies or practices.

Thus, even assuming hypothetically that the Local breached its DFR, Plaintiff has presented no evidence that would give rise to an inference of discriminatory motivations.

In conclusion, Plaintiff has failed to raise a genuine issue of material fact with respect to either element of her HRL claim against Local 1103. Summary judgment is therefore appropriate.

#### b. The National

Plaintiff argues that the National discriminated against her in violation of the HRL when it decided not to submit her grievance to arbitration after Verizon denied the grievance at the third stage. Plaintiff again must raise a genuine issue of material fact on both of the following questions: (1) Did the National breach its duty of fair representation when it made this decision? (2) If so, was that breach motivated by Plaintiff's race or gender?

#### i. DFR

█ There is no evidence that the union's decision not to take Plaintiff's dismissal to arbitration was arbitrary. It is well established that a union member does not have an absolute right to have her grievance taken to arbitration. *Vaca*, 386 U.S. at 191, 87 S.Ct. 903; *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1143 (2d Cir.1994) (noting that a union's DFR "does not require it to take every employee grievance to arbitration"). Indeed, it has

been held that a union has "considerable discretion ... in sifting out grievances which it regards as lacking merit." *Buchanan v. NLRB*, 597 F.2d 388, 394 (4th Cir.1979); *see also Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1126 n. 5 (5th Cir.1980). Judge Mukasey explained that:

> If a member could unilaterally compel the union to go to arbitration, employer confidence in the settlement system would diminish as the number of meritless claims rose. *Vaca*, 386 U.S. at 191–92 [87 S.Ct. 903, 17 L.Ed.2d 842]. Thus, to preserve the value of the arbitration process, unions must be accorded wide discretion to determine, in a good faith, non-arbitrary manner, whether a particular grievance warrants arbitration.... Pursuing a meritless grievance harms the bargaining unit as a whole by draining limited resources and jeopardizing the Union's credibility in the eyes of management. Even if the Union made an erroneous determination regarding the merit of plaintiff's claim, so long as the decision not to arbitrate was made in good faith, as it was here, the Union cannot be held liable for unfair representation. *Vaca*, 386 U.S. at 192–93, 87 S.Ct. 903.

*DeGennaro v. New York City Hous., Auth.*, 1995 WL 37850, at *6 (S.D.N.Y. Jan.31, 1995).

 At the time of its decision, the National explained to Plaintiff that, based on past arbitration decisions and the fact that her supervisor was an eyewitness to her infraction, it had little or no chance of succeeding before an arbitrator, because the National was limited to contesting the question of whether the infraction in fact occurred. The NLRB concluded that the National's decision was reasonable and made in good faith.

Plaintiff argues that there exists a purported (unwritten) agreement between Verizon and the CWA that a work-time violation only occurs when an employee is not performing her duties for more than thirty minutes during the day. She argues that in light of this "agreement," CWA's refusal to arbitrate in her case gives rise to an inference of discrimination.

As evidence of the existence of the "30 minute rule," Plaintiff points to the fact that the National took the case of Rodney Rodgers—a man (race unknown)—to arbitration because he was arguably absent from work for less than 30 minutes.

Unfortunately for Plaintiff, this particular theory recovery *is* preempted, because it would require the court to interpret the term "work time violation" in the CBA or arbitral decisions interpreting the CBA to determine her state law claim.

Plaintiff has thus failed to raise a genuine issue of material fact on the question of whether the National's decision not to arbitrate was arbitrary, discriminatory, or tinged with bad faith. Therefore, the first element of her HRL claim fails as a matter of law.

#### ii. Discrimination

Even if Plaintiff had raised a material issue of fact with respect to the National's breach of its DFR, Plaintiff presents no evidence from which it could be inferred that the National did so because of Plaintiff's race or gender. It is not enough that Plaintiff is a black woman and the National failed to arbitrate. But that is all Plaintiff offers.

Even if she had presented a prima facie case of discrimination, Plaintiff has done nothing to show that the National's proffered reason for its decision—that her case was weak—is a pretext for discrimination.

### VERIZON

b. *Verizon's motion for summary judgment is granted.*

Plaintiff alleges that Verizon discriminated against her on the basis of her race

and gender, in violation of Title VII and the New York State Human Rights Law (HRL). Verizon argues that Plaintiff has failed to make out a prima facie case of discrimination, and that even if she had, she has failed to show that Verizon's proffered non-discriminatory reasons for their actions are pretexts for discrimination.

For the reasons stated below, Verizon's motion for summary judgment is granted.

### i. Plaintiff has failed to make out a prima facie case of discrimination [1]

 Under the familiar *McDonnell Douglas* burden-shifting framework, a plaintiff claiming that she was subjected to race discrimination in violation of Title VII or the HRL must first establish a prima facie case by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for her position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668(1973); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *James v. New York Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000).

 The courts have made clear that the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion "at the prima facie stage is *de minimis.*" *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1998) (affirming summary judgment, but rejecting district court's rationale that prima facie case had not been established).

Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances "giv[e] rise to an inference" of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.

 Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. *See McDonnell Douglas,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668; *St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. 2742; *James,* 233 F.3d at 154. The employer's burden is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Ctr.,* 509 U.S. at 509, 113 S.Ct. 2742.

 "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Thus, once the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out and the plaintiff has the opportunity to demonstrate that the proffered reason was a pretext for discrimination. *Burdine,* 450 U.S. at 254–56, 101 S.Ct. 1089; *see Darrell v. Consol. Edison Co. of New York, Inc.,* 2004 WL 1117889, at *8 (S.D.N.Y. May 18,

---

**1.** As a general matter, employment discrimination claims brought pursuant to the Human Rights Law are evaluated under the same standards that apply to Title VII cases. *Edwards v. Town of Huntington,* 2007 WL 2027913, *3 (E.D.N.Y. July 13, 2007); *see also Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 (2d Cir.2006); *Whidbee v. Garzarelli Food Specialties. Inc.,* 223 F.3d 62, 69 (2d Cir.2000).

2004). While "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason," *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742, under appropriate circumstances, a trier of fact can reasonably infer from the falsity of the explanation that the employer is "dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus "the factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* at 147, 120 S.Ct. 2097. However, as the Supreme Court has noted, an employer would be entitled to judgment as a *matter of law* if the record conclusively revealed some other, nondiscriminatory reason for the employer's reason, or if the plaintiff only created a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred. *Id.* at 148, 120 S.Ct. 2097.

▇▇ The Second Circuit has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James*, 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097). Although summary judgment must be granted with caution in employment discrimination actions, "Summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir.1994); *see also Darrell*, 2004 WL 1117889, at *8; *Alston v. New*

*York City Transit Auth.*, 2003 WL 22871917, at *4–5 (S.D.N.Y. Dec.3, 2003). Thus "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *see also Goenaga v. March of Dimes Birth Found.*, 51 F.3d 14, 18 (2d Cir.1995) (non-moving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible").

Title VII also forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII. *See* 42 U.S.C. § 2000c–3(a): *Kessler v. Westchester County Dept. of Social Serv's.*, 461 F.3d 199, 205 (2d Cir.2006). To establish a prima facie case of retaliation, a plaintiff must present evidence sufficient to permit a rational trier of fact to find that: (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001).

The Complaint can be fairly read to allege distinct violations against Verizon based on (1) discriminatory discharge and (2) retaliatory discharge, and (3) Plaintiff's work and equipment assignments.

### 1. Discharge (discriminatory and retaliatory)

With respect to her 2004 discharge Plaintiff has clearly established the first and third elements of her claim: Plaintiff is a member of two protected groups, and being fired is clearly adverse employment action. However, Defendant argues that

Plaintiff has failed to come forward with any evidence that she was performing her duties satisfactorily at the time of her termination. Defendant is correct.

a. Plaintiff has not made a prima facie case because she cannot show that she was performing her job in a satisfactory manner at the time of her termination

 "In determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors." *Riddle v. Liz Claiborne, Inc.*, 2006 WL 3057289, at *7 (S.D.N.Y. Oct.27, 2006) (citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985)). Job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance "met his employer's legitimate expectations." *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir.1983): *see Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir.1980); *Reich v. New York Hosp.*, 513 F.Supp. 854, 859 (S.D.N.Y.1981).

 Here, Plaintiff has not carried her prima facie burden of showing that her work performance was satisfactory. Defendant submits numerous employer evaluations. Verizon Exs. 16, 18, 19, 20, 40, 41. On many, Plaintiff receives no rating at all, due either to her long absences from work, or to the fact that Plaintiff was so rarely able to work on her own that her individual performance could not be evaluated. When Plaintiff was rated, she was almost universally rated below target standards. Plaintiff's trouble mastering her position led Verizon to seek to remove her from the Program within the first six months of her employment as a TTA, and for the next seven years she continued to receive poor performance reviews, and was twice placed in the remedial Service Excellence Plan.

Plaintiff's only response to this voluminous evidence of unsatisfactory performance is her bare-bones contention, made for the first time in her opposition brief, that the evaluations themselves were conducted in a discriminatory fashion. Plaintiff's conclusory allegation is not supported by any evidence.[2]

Plaintiff submitted a technician report card for the first half of 1998, six years prior to her dismissal. Pl.s Ex. 6. This document shows that Bryant was completing an average of 0.4 jobs per 8 hours—the minimum target for that rate is 2.5. In the last month covered, June of 1998, Bryant was below target in every category for which she was rated. Plaintiff also submitted her 2002 evaluation, but this reveals that Plaintiff was not performing satisfactorily. PL's Ex. 5 (2002 evaluation) ("Barbara seems lost at times [and] needs to improve," "Below group standard," "has gotten worse [in Quantity/Productivity]!!"). Finally, Plaintiff submitted quality inspection reports for the months of February through April 2004, her last three months at Verizon. Pl.s Ex. 8. Each one of these reports rates Bryant below target and admonishes her to work on customer contact skills. They are hardly evidence of adequate job performance.

The case is similar to *McLee v. Chrysler Corp.*, 109 F.3d 130 (2d Cir.1997). There, plaintiff was an African American employee of Chrysler Corporation. Plaintiff received two evaluations while at Chrysler. In the first, he was rated average. In the second, however, plaintiff was rated below average in 13 out of 22 categories. Shortly after the second evaluation, plaintiff was absent from work for two days. He claimed his absence was authorized by a doctor's note. However, the note only told

---

2. At her deposition, Plaintiff was asked to identify every act she claimed was discriminatory. She did not indicate that her evaluations had been conducted in a discriminatory manner.

plaintiff to take one day off of work, not two. Plaintiff was fired for taking off the extra day. He filed suit, arguing that Chrysler had terminated him because of his race in violation of Title VII. *Id.* at 131–34.

Judge Rakoff granted summary judgment to the defendant, reasoning that plaintiff had failed to make a prima facie case of discrimination, because he failed to show—based on his employer performance reviews—that he was performing his job satisfactorily. *Id.* at 133–34. The Second Circuit affirmed.

The result here follows *a fortiori* from McLee, as this is a much stronger case for granting summary judgment on the ground that Plaintiff has failed to show satisfactory job performance. In *McLee*, the court relied on two evaluations, only one of which was negative, and only with respect to half of the evaluated categories. Here, by contrast, Verizon submits evaluations spanning the entirety of Plaintiff's tenure as a TTA and Field Technician. In each one concern is expressed regarding Plaintiff's job performance and ability to work with customers. At no point did Plaintiff receive a satisfactory rating in job performance. The record of less than satisfactory performance is extensive and well documented.

Because Plaintiff provides not a scintilla of evidence that she performed her job in a satisfactory manner, she has not made out a prima facie case of discrimination. As a result, summary judgment will be granted on her discrimination claim.

b. Plaintiff has failed to state a claim for retaliatory discharge because the activity she claims brought about her termination is not "protected activity"

Plaintiff has also failed to make out a prima facie case that her discharge was retaliatory.

■ As noted, Plaintiff bears the burden of showing that: (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001).

■ Plaintiff suggests that she was fired, at least in part, for her refusal to accept a transfer to a different group. Her claim fails to show retaliation, however, because refusing to accept a transfer is not "protected activity."

■ The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *Cruz v. Coach Stores,* 202 F.3d 560, 566 (citing *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134–35 (2d Cir.), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999)). It is undisputed that Plaintiff never complained about race or gender discrimination to anyone at Verizon. Plaintiff's refusal to accept a transfer cannot be construed as a "protest ... oppos[ing] statutorily prohibited discrimination" on the undisputed facts of this case.

Because Plaintiff has failed to properly allege protected activity, her retaliation claim fails as a matter of law.

### 2. Working condition

Plaintiff also includes allegations regarding the working conditions at Verizon, The basis of these claims is Plaintiff's suggestion that she was not given necessary equipment, and was assigned to undesirable or dangerous work locations.

#### a. Plaintiff has not made out a prima facie case that she was subjected to a hostile work environment.

 To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive— that is ... creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's [membership in a protected class]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citing *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir.2001) (internal citations and punctuation omitted)).

Plaintiff offers no evidence tending to establish either the first or the third elements.

*Equipment*

 As to equipment assignments, Plaintiff asserts that she at times did not have the necessary equipment, or had to borrow it. Her only concrete allegations are that, for a time, she went without a buzzer and a belt. Plaintiff admits that she was able to borrow both of these when she needed them for a job. Being forced to borrow equipment occasionally, is not, in and of itself, "objectively severe;" that is, a reasonable person would not find the conditions "hostile" or "abusive." *Patane*, 508 F.3d at 113.

Even if it were, Plaintiff offers no evidence that her lack of equipment was "because of" her race or gender. It is undisputed that equipment is assigned on a first come, first served basis when new shipments of equipment arrived. It is also undisputed that Bryant missed long periods of work, and hence missed deliveries of new equipment. The parties also agree that equipment was also distributed according to job requirements, and that Bryant was unable to perform many duties and was therefore assigned to work with another technician. As to the buzzer, Plaintiff admits she only had to borrow one because she had lost her own.

Hence, on the undisputed evidence, Plaintiff's claim fails as a matter of law.

*Work assignments*

 Plaintiff alleges that she was assigned alone to dangerous two-man locations. However, Plaintiff produced no evidence of a single time she was assigned to a two-man location alone. Her only evidence with respect to "dangerous" locations is that one Verizon customer she had serviced is located "in the projects." She gives no other dangerous locations, or dates when she was forced to work them alone.

Plaintiff admits that she never complained about her work assignments, and she does not contest that it is Verizon's policy to reassign any employee who asks. In addition, due to her inability to work alone, Bryant often worked with another technician, and she was assigned to a group that dealt exclusively with large businesses.

Even assuming that Plaintiff presented sufficient evidence to make a prima facie showing that her work assignments amounted to an "objectively severe" work environment, she has not produced any evidence tending to show that she was assigned as she was "because of" her race or gender. Plaintiff produces no evidence of a policy of assigning African Americans or women to dangerous locations, or that white people or men are assigned to safer locations. She points to no words or conduct suggesting that race or gender played any role in her work assignments.

In conclusion, there is no evidence showing that Plaintiff's work environment was "objectively severe;" even if there were,

there is no evidence from which to infer that Plaintiff's race or gender was the cause.

b. Plaintiff has failed to make a prima facie case of race or gender discrimination, because the conduct complained of does not rise to the level of adverse employment action, and because she offers no evidence from which a discriminatory motivation could be inferred

■ For many of the same reasons, Plaintiff has not made out a prima facie case of race or gender discrimination on the basis of either the assignment of equipment or jobs. As with her termination claims, Plaintiff bears the burden of establishing that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for her position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *James v. New York Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000).

As noted in regards to her termination claim, Plaintiff has failed to show that she was qualified for her position or performing it satisfactorily at the time of the allegedly adverse employment action (the second element of a prima facie *McDonnell Douglas* claim). Plaintiff has also failed to offer evidence from which a discriminatory motivation can be inferred (the fourth element of a prima facie *McDonnell Douglas* claim). There is nothing in the record indicating any different treatment to which Plaintiff, or any other women or African American, was subjected. There is no evidence of racist or sexist remarks, or of policies or practices disfavoring Plaintiff or

other members of a protected class. There is no circumstance revealed in the evidence that is at all suggestive of discrimination, aside from the bare fact of Plaintiff's membership in a protected class. This is insufficient.

Finally, given that Plaintiff was always able to get the equipment she needed, and has not produced evidence showing that she was regularly assigned to dangerous locations, she has not shown "adverse employment action" (the third element of a prima facie *McDonnell Douglas claim*).

c. Even if Plaintiff has stated a prima facie case, she has offered no evidence to show that Verizon's proffered justifications are pretextual

■ Even assuming Plaintiff had presented evidence establishing a prima facie case of discrimination on the basis of her working conditions, she has not responded to Verizon's proffered non-discriminatory explanations. Verizon offers evidence that equipment was distributed on a first come, first served basis, and otherwise according to need. Verizon has also offered evidence that the reason Plaintiff went without a buzzer is that she lost hers, and that even then she did not go without because she was able to borrow one.

As to work assignments, Verizon asserts that it assigns jobs based on a technician's ability, and that any employee who feels unsafe will be reassigned. It is undisputed that Plaintiff never asked for reassignment on this basis.

Plaintiff offers no evidence tending to show that the reasons are false, or that gender or race animus is the true explanation. Again, the fact she is a black woman, without more, does not admit any inference of discrimination. Thus, even had she established a prima facie case on her non-termination claims, her claim nevertheless fails as a matter of law on the undisputed evidence.

### IV. Conclusion

The motions for summary judgment are GRANTED. The clerk is instructed to close the case.